**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

TED ALLEN, aka; Ted Alan
Wachtin,
            *Defendant-Appellant.*

No. 05-50078

D.C. No.
CR-04-02162-LAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
November 17, 2005—Pasadena, California

Filed January 12, 2006

Before: William C. Canby, Jr., Ferdinand F. Fernandez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

Norma A. Aguilar, San Diego, California, argued the case and was on the briefs for the defendant-appellant.

Michelle P. Jennings, Assistant U.S. Attorney, San Diego, California, argued the case and was on the briefs; Carol C. Lam, U.S. Attorney, and Roger W. Haines, Jr., Assistant U.S. Attorney, San Diego, California, were on the briefs for the plaintiff-appellee.

## OPINION

BERZON, Circuit Judge:

Ted Allen was sentenced to twelve months imprisonment and three years supervised release after a plea of guilty for counterfeiting. At the sentencing hearing, the district court applied an enhancement not addressed in the plea agreement. Because the district court did not make the proper findings in considering the enhancement, we reverse and remand to pro-

vide it the opportunity to do so. We also conclude that the government did not breach the plea agreement by presenting a witness at the sentencing hearing as requested by the district court and questioning him. We therefore affirm the district court's decision in that respect.

## I. **Background**

On September 9, 2004, Ted Allen pleaded guilty to charges that he "knowingly bought, sold, exchanged, transferred, received or delivered a false, forged, or altered obligation or other security of the United States; to wit: counterfeit $100 Federal Reserve Notes; and did so with the intent that the obligation be passed, published, or used as true and genuine." The plea agreement stated that on or about May 25, 2004, Allen sold fourteen counterfeit $100 bills to an individual who knew that they were counterfeit. There was no charge in the superseding information to which Allen pleaded guilty alleging that Allen had manufactured any of the fourteen counterfeit $100 bills or possessed any counterfeiting devices or materials used in connection with them, nor did the plea agreement address any such allegations.

The plea agreement stated that the parties would "jointly recommend" the following guideline calculations:

| | | |
|---|---|---|
| 1. | Base Offense Level [USSG § 2B5.1] | 9 |
| 2. | Increase because Defendant possessed or controlled counterfeiting paper similar to a distinctive paper | +2 |
| 3. | Acceptance of Responsibility [§ 3E1.1] | -2 |
| | **Total Offense Level** | 9 |

Allen was permitted to request additional departures and adjustments, and the government was allowed to oppose such

requests. There was a provision in the plea agreement that the court was not bound by the plea agreement.

On January 24, 2005, the district court conducted a hearing on Allen's sentencing. The Pre-Sentence Report (PSR) presented at that hearing recommended a total offense level of fifteen. This recommendation differed from that contained in the plea agreement because the probation officer who prepared the PSR determined that U.S. Sentencing Guidelines Manual (Guidelines) sections 2B5.1(b)(2)(A) and (b)(3) applied.[1] Section 2B5.1(b)(2)(A) imposes a two-level increase on a defendant who has "manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting." Section 2B5.1(b)(3) raises the total offense level to fifteen if (b)(2)(A) applies and the resulting offense level is less than fifteen.

In an effort to determine whether the probation officer's recommendation was appropriate, the district court first asked the prosecutor whether materials used for counterfeiting had been found at Allen's residence. When the prosecutor responded that the search had uncovered a press,[2] the district court asked whether the prosecutor could bring in the secret service agent who could testify regarding what was found at Allen's residence. The prosecutor stated that she could probably locate the agent. The district court then asked the prosecutor to call the secret service agent to the stand to testify as to what had been found at Allen's house. Before doing so, the prosecutor clarified that the government stood by the recommendation to which it had stipulated in the plea agreement and that it was the district court that requested the testimony, stating: "To clarify, the United States is standing by its plea agreement and standing by its calculations. To clarify, your

---

[1] Unless otherwise indicated, all references to the United States Sentencing Guidelines Manual are to the 2004 edition.

[2] That response was erroneous, as it turned out.

honor, the court would like information from the case agent regarding whether Mr. Allen had custody and control over a counterfeiting device or materials used for counterfeiting?" Defense counsel objected, stating that she "anticipate[d] making an argument on breach."

Under questioning by both the prosecution and the judge, the secret service agent, Agent Graf, testified that he and other agents had discovered in Allen's trash "shreddings of counterfeit," "spray adhesive, the box for a shop press,[3] [and] rollers used to roll out each bill that was glued together." The district court then held that the PSR was correct and the calculation in the plea agreement incorrect. Defense counsel noted that the Guidelines instruct that 2B5.1(b)(2)(A) is not to apply "to persons who produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." U.S. Sentencing Guidelines Manual § 2B5.1 cmt. n.4. The district court never addressed the argument. Defense counsel argued that the prosecution had breached the plea agreement, but the district court rejected the argument.

The district court went on to determine that the offense level was fifteen, based on an enhancement for custody of materials used in counterfeiting, minus two for acceptance of responsibility for a total offense level of thirteen. The court sentenced Allen to the bottom of the Guidelines range, twelve months, with three years of supervised release. The plea agreement specifically reserved Allen's right to appeal if the sentence was greater than ten months. Allen appeals from this sentence.

---

[3]A "shop press" is "a machine that's used to press paper together, to apply a signature on with pressure." In Agent Graf's experience, this tool could be used to manufacture counterfeit bills.

## II.  **Standard of Review**

Allen argues that the district court misinterpreted the Guidelines in determining his sentence. The district court recognized that the Guidelines are no longer mandatory but stated that it was using them as persuasive guidance. As the district court's interpretation of the Guidelines essentially controlled its determination of Allen's sentence, we review its interpretation de novo. *See United States v. Smith*, 424 F.3d 992, 1015 (9th Cir. 2005) (citing *United States v. Kimbrew*, 406 F.3d 1149, 1152 (9th Cir. 2005)).

Where the defendant claims that the government breached the plea agreement and raises an objection to the alleged breach in the district court, the review is de novo. *See United States v. Mondragon*, 228 F.3d 978, 980 (9th Cir. 2000).

## III.  **Application of the Enhancement**

### A.  **Mootness**

[1] Allen was released November 10, 2005, before the scheduled oral arguments in this case. His three years of supervised release began then. We have previously established, however, that where a defendant has received a sentence that includes a period of supervised release, a challenge to the length of his sentence of imprisonment is not moot because the district court has discretion regarding the length of supervised release, *see* 18 U.S.C. § 3583(a)-(b), and can change the supervised release period, *see* § 3583(e)(2). *See Mujahid v. Daniels*, 413 F.3d 991, 994-95 (9th Cir. 2005).

[2] Here, the district court could resentence Allen to a shorter term of supervised release in light of a shorter appropriate term of imprisonment or to no term of supervised release. *See id.* at 994-95 (citing *Gunderson v. Hood*, 268 F.3d 1149, 1153 (9th Cir. 2001)); *United States v. Verdin*, 243

F.3d 1174, 1178 (9th Cir. 2001).[4] A district court must sentence a defendant to supervised release if the statute so requires, but this statute does not. *See* 18 U.S.C. § 473. The length of the imprisonment sentence is therefore not moot.

B.   **The Sentencing Guidelines and Application Note 4**

**[3]** After considering the PSR, the district court decided that section 2B5.1(b)(2)(A) applies. As noted, subsection (b)(2)(A), in conjunction with subsection (b)(3), increases to fifteen the level of the offense of counterfeiting where the defendant has "manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting." The information to which Allen pleaded guilty alleged only knowing sale of counterfeit currency, not possession of counterfeiting devices or material. The district court therefore conducted an evidentiary hearing regarding whether Allen had possessed counterfeiting devices or materials, as that additional fact was pertinent in applying the Guidelines. At the end of the hearing, the district court found that Allen had possessed materials used for counterfeiting and, applying subsections (b)(2)(A) and (b)(3), held that the appropriate Guidelines level was fifteen.

**[4]** Application Note 4 to section 2B5.1, however, states that "[s]ubsection (b)(2)(A) does not apply to persons who produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." U.S. Sentencing Guidelines Manual § 2B5.1 cmt. n.4. In applying subsection (b)(2)(A), the district court did not consider the quality of any notes. Allen argues that the district court therefore erroneously applied the enhancement.

---

[4]The Guidelines mandate supervised release only for sentences of more than one year. *See* U.S. Sentencing Guidelines Manual § 5D1.1(a).

Few cases have considered the applicability of Application Note 4. All of those cases, moreover, addressed an earlier version of the Application Note which excluded from subsection (b)(2)(A) those who "merely photocopy notes or otherwise produce [counterfeit] items." U.S. Sentencing Guidelines Manual § 2B5.1 cmt. n.4 (2000); *see also* U.S. Sentencing Guidelines Manual § 2B5.1 cmt. n.3 (1995). The cases interpreting the predecessors to present Note 4 concerned enhancements for photocopying counterfeit notes and did not address the application of Note 4 to those in possession of counterfeiting devices. *See, e.g.*, *United States v. Miller*, 77 F.3d 71, 76 (4th Cir. 1996); *United States v. Taylor*, 991 F.2d 533, 535 (9th Cir. 1993); *United States v. Bruning*, 914 F.2d 212, 213 (10th Cir. 1990).

Note 4 does not differentiate between the manufacturing and possession of counterfeiting devices aspects of subsection (b)(2)(A). Rather, it applies across the board, advising that the enhancement under subsection (b)(2)(A)—and, consequently, the offense level of fifteen prescribed by subsection (b)(3)— "does not apply" to obviously counterfeit currency. As application notes to Guidelines provisions must be used in determining the proper offense level, *see United States v. Hernandez-Sandoval*, 211 F.3d 1115, 1117 n.3 (9th Cir. 2000), Note 4 requires consideration of the notes produced through use of the counterfeiting devices or materials possessed.

The government maintains, however, that Note 4 cannot apply to persons who merely have "custody of or control over a counterfeiting device or materials used for counterfeiting," U.S. Sentencing Guidelines Manual § 2B5.1(b)(2)(A), because there may be no counterfeit currency for the factfinder to scrutinize in deciding whether the items would pass minimal scrutiny. We are not at liberty to ignore the wording of the commentary, which is not restricted solely to the "manufactured or produced" language of (b)(2)(A). The Commission could have subdivided subsection (b)(2)(A) as it did

subsection (b)(2)(B), but failed to do so. There is, consequently, no basis in the language or structure of the Guidelines for the distinction the government propounds.

Nor is there a practical problem with applying Note 4 to all rather than part of subsection (b)(2)(A) sufficient to justify a less than literal reading of the Note. *Cf. County of Santa Cruz v. Cervantes* (*In re Cervantes*), 219 F.3d 955, 960-61 (9th Cir. 2000) ("[W]hile the plain language of a statute is not always conclusive, we ignore plain language only when a 'literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result.' " (quoting *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989))).

**[5]** Subsection (b)(2)(A) applies only to a defendant who "had custody of or control over a counterfeiting device or materials *used for counterfeiting*." U.S. Sentencing Guidelines Manual § 2B5.1(b)(2)(A) (emphasis added). The "Background" section of the Guidelines Commentary explains, "Possession of counterfeiting devices *to copy obligations* . . . of the United States is treated as an aggravated form of counterfeiting because of the sophistication and planning involved in manufacturing counterfeit obligations . . . ." *Id.* § 2B5.1 cmt. background (emphasis added). Moreover, in amending subsection (b)(2)(A) in 2001, the Sentencing Commission reiterated that the intent of the enhancement is to "ensure some degree of additional punishment for all offenders who *engage in manufacturing activity*." U.S. Sentencing Guidelines Manual app. C, amend 618 (2001) (emphasis added).

**[6]** Thus, the enhancement was meant to apply only where there is some linkage to the actual production of counterfeit obligations. We therefore conclude, on the basis of the language of the enhancement and the Commission's commentary, that the enhancement applies only if the devices or materials are "*used* for counterfeiting," *id.* § 2B5.1(b)(2)(A) (emphasis added), by someone. Possession or custody over

devices or materials that could be used for counterfeiting but have not been does not count.

The Eleventh Circuit came to the opposite conclusion in *United States v. Castillo*, 928 F.2d 1106, 1108 (11th Cir. 1991). That opinion is, however, not persuasive in this case, because the enhancement provision was amended in 2001 in a way inconsistent with the result in *Castillo*.

*Castillo* interpreted subsection (b)(2)(A) to apply to possession of a counterfeit deterrent. *See id.* at 1107-08. Section 2B5.1 was amended in 2001, however, to add subsection (b)(2)(B), specifically addressing possession of counterfeit deterrents. The enhancement to the offense level of fifteen applies only to (b)(2)(A), not to (b)(2)(B). *See* U.S. Sentencing Guidelines Manual § 2B5.1(b)(3). Thus, the provision that *Castillo* relied on, subsection (b)(2)(A), no longer applies to the circumstance to which *Castillo* applied it. The Commission provided a lesser enhancement in that circumstance, in effect rejecting the result reached in *Castillo*. Further, the Eleventh Circuit did not have the benefit of the "Reason for Amendment" discussion that accompanied the 2001 amendment, making clear that subsection (b)(2)(A) is meant to apply to offenders who "engage in manufacturing activity." That commentary confirms that it is crucial that someone have "used" the device or material possessed by the defendant to be subject to the enhancement; otherwise there has been no "manufacturing activity" in which the defendant is engaged.

Ordinarily, the government's proof that counterfeit devices or materials were "used" to produce counterfeit obligations will consist of the obligations thus produced. In this case, for example, the government could presumably present to the court the fourteen counterfeit bills Allen sold, as long as there is a basis for linking those bills to the materials used for counterfeiting. Where notes were successfully passed to someone who did not know of their origin, no further testimony on quality may be necessary. *See Miller*, 77 F.3d at 76 (declining

to apply the exception to the enhancement and remanding to the district court for factfinding where one of the counterfeit bills was successfully passed); *see also United States v. Stanley*, 23 F.3d 1084, 1086 (6th Cir. 1994) (declining to apply the exception to the enhancement where multiple counterfeit bills were successfully passed). Here, however, Allen's bills went only to a person who knew that they were counterfeit. Expert testimony could establish the quality of the counterfeit obligations that particular devices or materials were used to produce or the likely quality of such obligations if the counterfeits themselves are for some reason not available.

We do not, however, decide whether expert testimony is necessary for this purpose, or whether the court could decide on the basis of its own perception of the phony currency documents that they are or are not of such quality that they are "unlikely to be accepted even if subjected to only minimal scrutiny." U.S. Sentencing Guidelines Manual § 2B5.1 cmt. 4. Our point, instead, is that the nature of the necessary evidence is the same in all the circumstances covered by the enhancement. Whether the enhancement is based on manufacturing and production or on possession of counterfeiting devices or materials, the notes are likely to be available but may not be, and the notes may be obviously sufficiently realistic that Note 4 does not apply, or there may be need for further evidentiary proof on the point. Put another way, as the counterfeiting devices or materials must be "used," no special evidentiary problem arises from applying Note 4 as written.

At oral argument, the government largely abandoned its contention that Note 4 applies to some but not all of subsection (b)(2)(A) and instead relied on the narrower proposition that the burden of proof under Note 4 in establishing the quality of the counterfeit currency is on the defendant. We do not agree.

In general, "the burden of proof falls on the party seeking to adjust the offense level." *United States v. Howard*, 894

F.2d 1085, 1089-90 (9th Cir. 1990) (citing with approval *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989)); *see also United States v. Ameline*, 409 F.3d 1073, 1085-86 (9th Cir. 2005) (en banc); *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994) ("The government bears the burden of proving, by a preponderance of the evidence, the facts necessary to enhance a defendant's offense level under the Guidelines.").[5] Thus, the defendant does not bear the burden of proof with regard to sentencing enhancements, as it is not the defendant who is seeking a higher offense level.[6] *See United States v. Pimentel-Flores*, 339 F.3d 959, 968 (9th Cir. 2003). The government maintains that this basic principle does not apply here because Note 4 establishes either an exception or an affirmative defense, and the burden should be on the proponent of the exception or affirmative defense. *See, e.g.*, *United States v. Culps*, 300 F.3d 1069, 1081-82 (9th Cir. 2002).

This contention fails. The application notes to the Guidelines are exactly that—notes about when a particular Guideline applies and when it does not. Note 4 so reads: It explains that subsection (b)(2)(A) "does not apply" to transparently counterfeit currency, the equivalent of stating that the subsection applies only to notes that could be taken as real. As the defendant bears no burden to establish that circumstances exist in which subsection (b)(2)(A) *does* apply, he bears no burden to demonstrate that the counterfeiting devices and materials he possessed produced or could produce realistic counterfeits.

---

[5]In *United States v. Lewis*, 979 F.2d 1372, 1375 (9th Cir. 1992), which distinguished *Howard* as not pertinent, the question was not the application of burdens of proof to determine a factual question but whether the court, as opposed to the government, could elicit the pertinent evidence.

[6]It is worth noting that if on remand the government independently presents an affirmative case for the application of this enhancement, it will most likely breach the plea agreement.

The government argues that even if the district court was mistaken in applying the subsection (b)(2)(A) enhancement, the overall sentence was reasonable. When the district court calculates the Guidelines incorrectly, however, and then essentially indicates that its decision is controlled by its incorrect calculation, the sentence cannot have been reasonable.[7] *See Kimbrew*, 406 F.3d at 1154 (remanding where the district court made a legal error in applying an enhancement). We therefore remand to the district court so it can apply subsection (b)(2)(A) properly.

**[7]** In sum, we hold that Note 4 applies to all of section 2B5.1(b)(2)(A). Where the enhancement is to apply, the judge must therefore determine whether the quality of the bills for which the devices or materials were used is sufficiently high that the bills could plausibly pass as real currency.

## IV. **Compliance with the Plea Agreement**

Allen maintains that the government breached the plea agreement by participating in the evidentiary hearing regarding the possession of counterfeiting devices or materials ordered by the district court. The prosecutor, as noted, found a witness who could provide information supporting the enhancement, as requested by the district court and questioned that witness, thereby eliciting information that provided the basis for a greater sentence than the one upon which the prosecutor and Allen had previously agreed. Allen argues that by doing so, the prosecutor went beyond her duty of candor to the court and so undermined its promise in the plea agreement to recommend an offense level of nine as to breach the plea agreement. We reject this proposition, with the cau-

---

[7]While the district court did indicate that it was not bound by the Guidelines, it went out of its way to emphasize their provenance and to compliment those who had devised them. It also indicated that they were "better, more scientific, [and] fairer" than individualized judicial sentencing. It then sentenced Allen to the precise term suggested by the Guidelines.

tion that our decision is premised on the distinct facts of this case, not on any broad sanction of the procedure used here.

**[8]** A plea agreement is a contract and is enforced as such. *See United States v. Mondragon*, 228 F.3d 978, 980 (9th Cir. 2000); *United States v. Johnson*, 187 F.3d 1129, 1134 (9th Cir. 1999). Because the defendant in a plea agreement relinquishes his constitutional right to a trial, *INS v. St. Cyr*, 533 U.S. 289, 321-22 (2001), "[t]he integrity of our judicial system requires that the government strictly comply with its obligations under a plea agreement," *Mondragon*, 228 F.3d at 981.

Allen agreed to plead guilty to the superseding indictment. In exchange, the government agreed to recommend, jointly with Allen, the offense level of nine with a sentence in the middle range.[8]

Allen does not argue, as he cannot, that the government should not have answered the district court's questions.[9] "[A] plea agreement does not bar the government from honestly answering the district court's questions. To the contrary, honest response of the government to direct judicial inquiry is a prosecutor's professional obligation that cannot be barred, eroded or impaired by a plea agreement." *United States v. Maldonado*, 215 F.3d 1046, 1052 (9th Cir. 2000). On the other hand, an "attempt by the government to influence the

---

[8]The plea agreement first stated, "The parties will jointly recommend the following Base Offense Level, Specific Offense Characteristics, Adjustments and Departures (if applicable) under the Guidelines." The resulting calculation was "**Total Offense Level** 9." The plea agreement then stated, "The Parties will jointly recommend that defendant be sentenced to the *middle* of the guideline range found by the Court."

[9]The prosecutor's answer to those questions was erroneous. She answered that the trash pull at Allen's house turned up a shop press, when it actually only discovered the packaging for a press and materials usable for counterfeiting. That distinction, however, lacks significance for the issue before us.

district court" to impose a harsher sentence than the one to which the government agreed in the plea agreement to recommend would violate the agreement. *Mondragon*, 228 F.3d at 980-81.

The government's actions in this case were not an attempt to persuade the district court to impose a higher sentence. The prosecutor reiterated the government's support for a total offense level of nine and indicated that she was responding to the district court's requests only because the court had so requested. The plea agreement contained no provision forbidding the prosecutor to respond to requests by the district court or to present evidence when specifically requested to do so. Nor is there any suggestion at all in this record that the prosecutor was in any way responsible for encouraging the probation officer to include a higher offense level recommendation than was contained in the plea agreement, or that she induced the district court to pursue that recommendation.

Allen argues that the government's presentation of evidence was more damaging to him than if it had merely expressed an opinion inconsistent with the plea agreement. He cites *United States v. Boatner*, 966 F.2d 1575 (11th Cir. 1992), in support of his position. *Boatner*, however, held that when the government *volunteers* evidence that the plea agreement is inaccurate or incomplete, the government breaches the plea agreement even if it simultaneously states that it "will stick to its stipulation" in the plea agreement. *See id.* at 1579. In *Boatner*, the government contradicted the facts in the plea agreement not in response to questioning by the district court but rather in response to the defendant's claim that the facts in the PSR were incorrect. In this case, however, the government did not argue, unprompted, that Allen manufactured the counterfeit bill. Instead, the government responded to the district court's specific requests.

[9] Although this court has not addressed this precise factual scenario, helpful guidance is available from the District

of Columbia Circuit. In *United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000), the court found no breach of the plea agreement where the prosecutor presented and questioned a witness upon the district court's request. In *Ahn* as in this case, the questioning of the witness provided only the factual material for the district court to apply an enhancement. *See id.* at 38. *Ahn* concluded that because "[t]he court undoubtedly understood the nature and purpose of this questioning," there had been no breach. *Id.*; *see also United States v. Hand*, 913 F.2d 854, 856-57 (10th Cir. 1990) (holding that prosecutor's cross-examination of the defendant and a witness about defendant's involvement in the crime did not breach a promise in the plea agreement to recommend reduction based on minor role).

**[10]** Here, the questioning was neutral and brief, eliciting only the bare facts of what Agent Graf found in his trash pull. The district court, aware of the prosecutor's dilemma, noted that it "tried to take over some of the questioning there to take the onus off [the prosecutor] so it's not looking like she's pushing me to do anything rather than find that Mr. Allen is a lower guideline range." The district court thus asked the questions that clarified the investigation revealed scissors; explained the meaning of "shop press"; and detailed the significance of the items found. The prosecutor did not question the agent on redirect.

A prosecutor certainly *could* breach a plea agreement by questioning a witness in support of a sentence higher than the one it promised to support, even if such questioning is in response to a request by the district court. Because the line between neutral questioning and impermissible advocacy is thin, district courts should ordinarily conduct the questioning themselves where they feel it necessary to receive testimony in support of a sentence different from the one the prosecutor has agreed to recommend.

**[11]** Here, that preferable procedure was not followed. The combination of some judicial questioning and prosecutorial

care to present the testimony neutrally avoided, however, a breach of the plea agreement. We therefore affirm the district court's holding that the plea agreement was not breached.

## V.   Conclusion

**[12]** We reverse and remand for factfinding consistent with Application Note 4. We affirm the district court's decision that there was no breach of the plea agreement.

**REVERSED in part and AFFIRMED in part**.