**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

SUE ELLEN STATEN,
           *Defendant-Appellant.*

No. 05-30055

D.C. No.
CR-04-00039-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
December 6, 2005—Seattle, Washington

Filed June 7, 2006

Before: Ronald M. Gould and Marsha S. Berzon,
Circuit Judges, and William W Schwarzer,* District Judge.

Opinion by Judge Berzon

---

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

**COUNSEL**

June Lord, Great Falls, Montana, for defendant-appellant Sue Ellen Staten.

William W. Mercer, United States Attorney, and Joseph E. Thaggard, Assistant United States Attorney, United States Attorney's Office, Great Falls, Montana, for plaintiff-appellee United States of America.

**OPINION**

BERZON, Circuit Judge:

*United States v. Booker* held that although district courts are no longer required to follow the United States Sentencing

Guidelines ("Guidelines"), when making sentencing decisions, "the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals." 543 U.S. 220, 259 (2005) (citing 18 U.S.C.A. § 3553(a) (Supp. 2004)); *see also United States v. Cantrell*, 433 F.3d 1269, 1278 (9th Cir. 2006) ("[N]otwithstanding that the Guidelines are now effectively advisory, . . . district courts, while not bound to apply the Guidelines, 'should still consult them for advice as to the appropriate sentence.' " (citation omitted)). Concomitantly, as we have repeatedly held in the aftermath of *Booker*, we continue to have a duty to review district courts' required application of the Guidelines. We do so to assure that the district courts properly appreciate the advice offered by the now-advisory Guidelines before factoring that advice into their determination, under 18 U.S.C. § 3553(a), of the appropriate sentence. *See United States v. Mix*, 442 F.3d 1191, 1195 (9th Cir. 2006) ("[A]s was the case before *Booker*, the district court must calculate the Guidelines range accurately. A misinterpretation of the Guidelines by a district court effectively means that [the district court] has not properly consulted the Guidelines." (last alteration in original) (internal citations and quotation marks omitted)).

Conducting the requisite review of the post-*Booker* application of the Guidelines in this case, we conclude that the district court failed properly to take account of the appropriate factors when applying the Guidelines section 2D1.1(b)(5)(B) enhancement for creating a substantial risk of harm to human life or the environment. We therefore vacate the sentence imposed on Sue Ellen Staten and remand for resentencing.

## I.

The events which ultimately resulted in this appeal developed as follows:[1] On October 24, 2003, Sue Ellen Staten and

---

[1]The facts recited in this section reflect, for the most part, those recited in the presentence investigation report ("PSR") prepared by the probation office for the district judge. At sentencing, Staten confirmed that she had no objections to the facts recited in the PSR.

Jennifer Gatewood rented two adjacent rooms at the Terrace Motel, numbered 8 and 9. Later that night, Staten helped to carry a microwave into room 8, where Denis K. Loftis, Gatewood's boyfriend, had assembled equipment necessary to manufacture methamphetamine. Loftis and Staten were arrested in room 8 by officers who had been tipped off to the manufacturing operation. Because of the perceived hazardous environment, the motel was evacuated. A hazardous materials disposal team seized, among other things, the following items from the rooms: "a kitchen bowl containing iodine and red phosphorus; hypodermic syringes, one of which contained a clear liquid substance; a Pyrex plate with methamphetamine residue; canning jars containing a liquid substance; razor blades; a microwave oven; a *Fry Daddy* deep fat fryer; and several 20 ounce soft drink bottles containing liquid substances." The PSR concluded that Staten had conspired with Gatewood and Loftis in several manufacturing operations, which resulted in the "produc[tion] [of] a conservative amount of one-half gram of methamphetamine" on each occasion.

Staten pleaded guilty pursuant to a plea agreement to conspiracy to manufacture methamphetamine under 21 U.S.C. §§ 841(a)(1) and 846. The PSR, prepared on July 23, 2004, prior to the issuance of *Booker*, assessed a base offense level of twelve pursuant to Guidelines section 2D1.1(c)(14) and increased the offense level to twenty seven pursuant to section 2D1.1(b)(5)(B). The latter provides for an increase of three offense levels or, if the resulting increase is less than twenty seven, an increase of the offense level to twenty seven "[i]f the offense involved (i) the manufacture of . . . methamphetamine; and (ii) *created a substantial risk of harm to (I) human life . . .* ; or *(II) the environment*." U.S. Sentencing Guidelines Manual § 2D1.1(b)(5)(B) (emphases added).[2] The PSR also

---

[2]The presentence investigation report relied on the 2003 edition of the Guidelines. Staten's sentencing occurred on January 27, 2005, at which

recommended a two-level decrease for acceptance of respon-
sibility pursuant to section 3E1.1(a) and a one-level decrease
for timely notifying government of her intention to plead
guilty pursuant to section 3E1.1(b). Because Staten fell into
criminal history category III, the PSR concluded that a Guide-
lines imprisonment range of sixty-three to seventy-eight
months was appropriate. *See id.* ch. 5, pt. A (Sentencing
Table).

The sentencing hearing occurred just after *Booker* was
decided. In light of *Booker*, the district court treated the
Guidelines as "advisory only." The district court allowed
argument about the PSR at the sentencing hearing and invited
counsel to raise any other pertinent information.

In response to that invitation, both parties submitted expert
reports with regard to the substantial risk of harm issue. Stat-
en's expert based his brief report on "the evidence and video
tape in this case." While "not disput[ing] [that] there exist[ ]
potential dangers for all clandestine methamphetamine labs,"
Staten's expert

> [could not] state, within a reasonable degree of sci-
> entific certainty, based upon the evidence found, evi-

---

point the 2004 edition of the Guidelines was in effect. According to the
Guidelines, a district court "shall use the Guidelines Manual in effect on
the date that the defendant is sentenced." U.S. Sentencing Guidelines
Manual § 1B1.11(a) (2004); *see United States v. Benitez-Perez*, 367 F.3d
1200, 1205 (9th Cir. 2004) ("A district court must apply the version of the
Sentencing Guidelines in effect on the date of sentencing, unless that
would pose an *ex post facto* problem."). It seems, therefore, that the wrong
version of the Guidelines was applied at Staten's sentencing. The 2004
amendments to the Guidelines, however, did not substantively change sec-
tion 2D1.1(b)(5), or its Application Note; subdivision (b)(5) simply was
redesignated as subdivision (b)(6). *See* U.S. Sentencing Guidelines Man-
ual § 2D1.1 hist. note (2004); *id.* app. C, amend. 667 (2004). As the ver-
sion used thus does not matter, we refer, as do the parties, to the 2003
edition of the Guidelines.

dence analyzed, lack of chemical odor notation and the video tape, any "real" hazards or dangers existed at the scene that would pose a significant threat or danger to any persons other than the cook and those present in the room.

The government's expert presented a report which detailed various "hazards associated with methamphetamine manufacture." According to this report, such hazards include the potential for flash fire caused by the atmospheric concentration of alcohol; "[the health hazard and dangers] associated with iodine tinctures or [the] handling of iodine crystals"; the generation of hydriodic acid, a respiratory irritant; the generation of hydriodic acid fumes and phosphine gas, both of which are potentially lethal; the possibility that the coffee or paint filters used to collect solid red phosphorus might auto-ignite; the dangers associated with handling caustic lye (sodium hydroxide); the need to dispose of chemical waste generated by the manufacturing process; the potential for others to be exposed to improperly disposed of waste; and the potential for subsequent occupants of the location of the manufacture to be "unwitting[ly] expos[ed] to methamphetamine residue and other hazardous by-products of the manufacturing process."

At sentencing, Deputy Jergens testified that while he was searching the motel room he found what appeared to be an uncovered container of iodine and an uncovered container of Coleman fuel. He also testified that between three and five people were evacuated from the motel, including two from an adjacent room.

Staten objected to the section 2D1.1(b)(5)(B) enhancement on the ground that the *Booker* advisory Guidelines remedy may not be applied to a pre-*Booker* crime and so, under *Blakely v. Washington*, 542 U.S. 296 (2004), the facts supporting the enhancement must be proved beyond a reasonable doubt. She also maintained that on any burden of proof, the

district court did not properly determine that the enhancement was supported by the established facts. The district court rejected both arguments, observing that any Guidelines calculation was "only an advisory component" of the factors it was obliged to consider under *Booker*. The district court then explained that, in its view, the substantial risk of harm enhancement was applicable. After recognizing that under *Booker* it was to consider all the factors set forth in 18 U.S.C. § 3553(a), the district court sentenced Staten to sixty-three months imprisonment with three years of supervised release to follow, a sentence within the calculated advisory Guidelines range.

Staten now reasserts the objections she raised at her sentencing: She argues, first, that the *Booker* advisory Guidelines regime cannot apply to her, as she committed her crime before *Booker* was decided, and that the failure to determine whether the facts supporting the enhancement were proven beyond a reasonable doubt therefore violated her due process rights. Second, she argues that the district court erred in determining that the evidence presented at the sentencing hearing and the facts established in the PSR support application of the section 2D1.1(b)(5)(B) substantial risk of harm enhancement.

## II.

"We review ex post facto challenges to sentencing decisions de novo." *United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997); *see also Hunter v. Ayers*, 336 F.3d 1007, 1011 (9th Cir. 2003). While the constitutional prohibition against ex post facto laws "by its terms, applies only to changes in the law resulting from legislative or executive action, . . . the [Supreme] Court has extended similar principles to the Due Process Clause to cover 'unforseeable [judicial] construction of a criminal statute.' " *United States v. Dupas*, 419 F.3d 916, 920 n.3 (9th Cir. 2005) (second alteration in original) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354-55 (1964)), *cert. denied*, 126 S. Ct. 1484 (Mar.

6, 2006). Staten asserts such a due process argument, which we review as we would a traditional ex post facto argument.

Under *Booker*, we review the ultimate sentence imposed under the factors set forth in 18 U.S.C. § 3553(a) for "reasonableness." *Cantrell*, 433 F.3d at 1279. If, however, "there was material error in the Guidelines calculation that serves as the starting point for the district court's sentencing decision, we will remand for resentencing pursuant to 18 U.S.C. § 3742(f), without reaching the question of whether the sentence as a whole is reasonable in light of § 3553(a)." *Id.* at 1280; *see also Mix*, 442 F.3d at 1195 ("If the district court incorrectly construed the Sentencing Guidelines, we must vacate the sentence and remand for resentencing.").

"[W]e . . . review 'the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of [a] case for abuse of discretion, and the district court's factual findings for clear error." *Cantrell*, 433 F.3d at 1279 (alteration in original) (quoting *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005)).[3]

---

[3]Prior to *Booker*, there was conflict in our case law regarding the standard of review for a district court's *application* of the Guidelines to a particular sentence. Some pre-*Booker* decisions employed an abuse of discretion standard. *See, e.g.*, *United States v. Alexander*, 287 F.3d 811, 818 (9th Cir. 2002) (" 'We review the district court's application of the Sentencing Guidelines to the facts of a particular case for abuse of discretion.' " (quoting *United States v. Leon-Reyes*, 177 F.3d 816, 824 (9th Cir. 1999))); *United States v. Robinson*, 94 F.3d 1325, 1327 (9th Cir. 1996). Other pre-*Booker* decisions reviewed a district court's application of the Guidelines de novo. *See, e.g.*, *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc) ("The district court's interpretation and application of the Sentencing Guidelines are reviewed de novo."); *United States v. Gonzalez*, 262 F.3d 867, 869 (9th Cir. 2001) (per curiam); *Ortland*, 109 F.3d at 543.

This conflict has continued post-*Booker*. In *United States v. Smith*, we stated that post-*Booker*, "we review 'the district court's application of the

## III.

### A.

Staten maintains that the Due Process clause "prohibits courts from applying the *Booker* remedy to the disadvantage of any criminal defendant whose crime was committed before *Booker* was decided," and that she therefore is entitled to the benefit of the Sixth Amendment rule that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 543 U.S. at 244; *see also Blakely*, 542 U.S. at 301 (" 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000))).

---

Sentencing Guidelines to the facts of this case for abuse of discretion' " 424 F.3d 992, 1015 (9th Cir. 2005) (quoting *Kimbrew*, 406 F.3d at 1151), *cert. denied*, 126 S. Ct. 1477 (Mar. 6, 2006) *and sub nom. Bates v. United States*, 126 S. Ct. 1770 (Apr 17, 2006). Both *Smith* and *Kimbrew*, though decided post-*Booker*, reviewed sentences imposed under the pre-*Booker* mandatory Guidelines regime. *See Smith*, 424 F.3d at 1017; *Kimbrew*, 406 F.3d at 1154. *Mix*, a "true" post-*Booker* case, follows the abuse of discretion standard set forth in *Smith*. 442 F.3d at 1195 ("We review the application of the Sentencing Guidelines to the facts of the case for abuse of discretion and factual findings for clear error." (*citing Smith*, 424 F.3d at 1015)). In contrast, one post-*Booker* decision indicates that the applicable standard of review is de novo. *See United States v. Williamson*, 439 F.3d 1125, 1137 n. 12 (9th Cir. 2006) ("We review the interpretation and application of the Guidelines de novo.").

As we would conclude that the district court here erred in its application of the Guidelines under *any* standard of review, we save for another day resolution of the standard of review for application of the Guidelines after *Booker*.

**[1]** Our decision in *Dupas* forecloses this argument. *See* 419 F.3d at 919-21 (holding that the application of *Booker*'s remedial holding to sentencing determinations on direct review does not violate retroactivity due process concerns), *cert. denied*, 126 S. Ct. 1484 (Mar. 6, 2006); *see also Mix*, 442 F.3d at 1198-99 (following *Dupas*). Like Dupas, when Staten committed her crime she had "sufficient warning of the potential consequences of [her] actions to satisfy . . . due process concerns." *Dupas*, 419 F.3d at 921 (holding that fair warning exists where the defendant had notice at the time of the offense "that his sentence could be . . . set within the applicable statutory maximum").

**B.**

**[2]** Staten's sentence was enhanced in accord with section 2D1.1(b)(5)(B) of the Guidelines. That section provides:

> If the offense (i) involved the manufacture of . . . methamphetamine; and (ii) created a substantial risk of harm to (I) human life other than a life described in subdivision (C); or (II) the environment, increase [the offense level] by **3** levels. If the resulting offense level is less than level **27**, increase to level **27**.

U.S. Sentencing Guidelines Manual § 2D1.1(b)(5)(B). Application Note 20(A), which applies to section 2D1.1(b)(5)(B), provides:

> (A) *Factors to consider*. In determining, for purposes of subsection (b)(5)(B) or (C), whether the offense created a substantial risk of harm to human life or the environment, the court *shall* include consideration of the following factors:
>
> > (i) The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the

manner in which the chemicals or substances were stored.

(ii) The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

(iii) The duration of the offense, and the extent of the manufacturing operation.

(iv) The location of the laboratory (*e.g.*, whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

*Id.* § 2D1.1(b)(5)(B) cmt. n.20(A) (emphasis added).

Staten submits that "there was no finding made in accordance" with Note 20(A). We agree, and hold that because the district court failed to take Note 20(A) into account, a remand for resentencing is necessary so that the district court can make the factual determinations required by that note.

**[3]** According to the Guidelines, the commentary that accompanies a given section "may interpret the guideline or explain how it is to be applied," and "[f]ailure to follow such commentary could constitute an incorrect application of the guidelines." *Id.* § 1B1.7. The Guidelines, including enhancements, are ordinarily applied in light of available commentary, including application notes. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."); *United States v. Allen*, 434 F.3d 1166, 1173 (9th Cir. 2006) ("The application notes to the Guidelines are exactly that — notes about when a particular Guideline

applies and when it does not."); *United States v. Lopez-Garcia*, 316 F.3d 967, 970 (9th Cir. 2003) ("We are bound to follow the application notes."); *United States v. McKinney*, 15 F.3d 849, 852 n.8 (9th Cir. 1994) (noting that "the district court was . . . obliged to assess [the defendant's] conduct in light of the 'appropriate considerations' listed in the application notes").

**[4]** Note 20(A) uses mandatory language. *See* U.S. Sentencing Guidelines Manual § 2D1.1(b)(5)(B) cmt. n.20(A) (noting that "for purposes of subsection (b)(5)(B) . . . , the court *shall* include consideration of the following factors" (emphasis added)); *see also United States v. Layne*, 324 F.3d 464, 469 (6th Cir. 2003) (noting that 2001 amendments to the Guidelines "made consideration of the factors set out in the Application Notes to [the substantial risk of harm enhancement] mandatory"). The district court, however, failed for the most part properly to consult the mandatory Note 20(A) factors, focusing instead primarily on factors present in any manufacture of methamphetamine: The court at sentencing observed that the report submitted by the government's expert showed that (1) *generally*, the manufacture of methamphetamine creates a hazard to the health of the person engaged in such manufacture and (2) studies had established that the manufacture of methamphetamine *can* leave detectable traces in the location of manufacture, creating a potential risk of exposure to later occupants. The court further observed that Staten's own expert had confirmed the "potential danger for *all* clandestine methamphetamine labs." (emphasis added). Based on these observations, the court stated:

> I don't see anything in that subdivision which, as we have noted, is, in its advisory capacity to this court, that suggests that a hazard to the cook is excluded by the process or that the hazard of handling methamphetamine that has been manufactured is excluded from the implications of the increase contemplated.

And I am taking as reasonable evidence the declaration from the statement of Mr. Ely that the carrying out of this process in a closed environment such as a hotel room, would put future occupants at the risk of unwitting exposure to the residues which are well-known to exist where such an operation has been carried out.

Therefore, under the guideline program, and emphasizing that this is an advisory matter only, it is my determination that the guideline calculation increase to an offense level of 27 is in fact appropriate in this case.

**[5]** The general observations made by the district court do not constitute adequate consideration of factors due under Note 20(A). Note 20(A) requires analysis of whether, and the extent to which, the specified considerations pertain on the facts of the particular case. The language of each Note 20(A) factor focuses on the circumstances involved in the prosecution at hand, not on generic dangers posed by methamphetamine manufacture: The note requires that the district court look to the specific "quantity of any chemicals or hazardous or toxic substances found"; "the manner in which the chemicals or substances were stored"; "the manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment"; "the duration of the offense, and the extent of the manufacturing operation"; and "the location of the laboratory (*e.g.*, whether the laboratory is located in a residential neighborhood or a remote area) and the number of human lives placed at substantial risk of harm." U.S. Sentencing Guidelines Manual § 2D1.1(b)(5)(B) cmt. n.20(A). As each enumerated consideration is cast in terms that demand inquiry into the details of the particular case, the district court may not rest application of the enhancement on facts that are necessarily common to most or every manufacture.

This focus on the specific characteristics of the particular manufacturing operation is fully consistent with the pertinent guideline. Section 2D1.1(b)(5)(B) applies where there is "the manufacture of . . . methamphetamine . . . *and* . . . a substantial risk of harm." *Id.* § 2D.1.1(b)(5)(B) (emphasis added). The conjunction indicates that the "substantial risk of harm" must be in addition to those inherent in the manufacture of methamphetamine.

**[6]** Here, the district court's reasons for applying the enhancement were, for the most part, not specific in nature, as required by Note 20(A). The court noted that *all* clandestine methamphetamine labs create a potential for danger, a consideration that is not pertinent under Note 20(A). The court then emphasized that nothing in the language of the enhancement precluded taking into account the risk posed to persons engaged in the manufacture of the drug or those handling the final product. The latter consideration, however, is *always* true for methamphetamine manufacture — someone will always be producing the drug and someone will always be handling the end product. The purpose of Note 20(A) — which, under section 2D1.1(b)(5)(B), applies exclusively to the production of methamphetamine and amphetamine — is to distinguish specific harms from generic ones, so as to justify a higher sentence than ordinarily attaches to the manufacture of those drugs. The district court's reliance on generic harms, such as the usual potential for harm to "the cook," was therefore improper.

The only case-specific factor spelled out in Note 20(A) that the district court mentioned was "the location of the laboratory," here, a motel room. Although the consideration that potential future motel room occupants who might come into contact with methamphetamine traces is case-specific, section 2D1.1(b)(5)(B) requires that the risk to human life and the environment must be "substantial" for the enhancement to apply. Note 20(A) specifies considerations pertinent to the substantiality requirement, including the quantity of toxic sub-

stances found, the manner in which they were stored, and the duration and extent of the manufacturing operation. The district court did not mention these considerations, even though the evidence showed an operation of short duration and extent. Yet, these factors are pertinent to whether the location-specific danger identified — the danger that future occupants might inhale or ingest methamphetamine residue — is substantial.

[7] We conclude that the district court's application of the section 2D1.1(b)(5)(B) enhancement, based in part on generic factors and in part on inadequate consideration of the Note 20(A) factors, constitutes reversible legal error.[4] *See McKinney*, 15 F.3d at 853 n.8 (finding district court's failure to consider application note factors to constitute reversible error).

## C.

[8] There is an additional reason that the district court's factual findings were inadequate: The government recognizes that the fifteen-level enhancement applied below resulted in a disproportionate sentence under the now advisory guidelines "since it increased [Staten's] offense level by more than four levels and more than doubled her sentence." The government accordingly posits that the facts underlying the sentence enhancement had to be proved by clear and convincing evidence, instead of a preponderance of the evidence, relying on pre-*Booker* case law to that effect. *See United States v. Peyton*, 353 F.3d 1080, 1088 (9th Cir. 2003) ("The application of the preponderance of the evidence standard, as opposed to the clear and convincing standard, violate[s] due process rights

---

[4]We do not mean to say that the district court must find each factor mentioned in Note 20(A) satisfied to apply the section 2D1.1(b)(5)(B) enhancement. All the district court is obliged to do is consider the factors and, applying those that are relevant, determine whether the *particular* manufacturing operation created a substantial risk of harm to human life or the environment in light of those relevant factors.

only if it le[ads] to enhancements that ha[ve] an 'extremely disproportionate effect on the sentence relative to the offense of conviction.' " (quoting *United States v. Mezas de Jesus*, 217 F.3d 638, 642 (9th Cir. 2000))); *United States v. Jordan*, 256 F.3d 922, 927-29 (9th Cir. 2001) (noting that enhancements that have a disproportionate impact on sentences must be established by clear and convincing evidence). We agree with the government that the clear and convincing standard still obtains for an enhancement with an extremely disproportionate effect, even though the enhancement now results in the calculation of an advisory rather than a mandatory Guidelines sentence.

In the aftermath of *Booker*, we have noted that while the preponderance of the evidence standard will still generally satisfy due process concerns, a heightened burden may sometimes be imposed. *See United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005) (noting, in a post-*Booker* review, that "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing," but, where an extremely disproportionate sentence results from the application of an enhancement, " 'the government may have to satisfy a "clear and convincing" standard' " (quoting *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999))).[5] Also, in *United States v. Lynch*, a post-*Booker* case that does not mention *Booker*, we reiterated the pre-*Booker* rule that "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the conviction, the government must prove such a factor by clear and convincing evidence." 437 F.3d 902, 916 (9th Cir. 2006) (en banc) (per curiam).

The continuing obligation of the district courts to calculate accurately the appropriate Guidelines sentence triggers the

---

[5]In *Dare*, however, we declined to extend this heightened disproportionate impact standard to "statutory mandatory minimum sentence[s]." 425 F.3d at 642.

very same due process concerns which led to the "dispropor-
tionate impact" rule in the first place.[6] In *United States v.
Restrepo*, we held that generally "due process does not require
a higher standard of proof than preponderance of the evidence
to protect a convicted defendant's liberty interest in the accu-
rate application of the Guidelines," 946 F.2d 654, 661 (9th
Cir. 1991) (en banc), but recognized that an exception to this
general rule might be required "when a sentencing factor has
an extremely disproportionate effect on the sentence relative
to the offense of conviction," *id.* at 659; *Jordan*, 256 F.3d at
930 ("It is now settled that when a sentencing factor has an
extremely disproportionate impact on the sentence relative to
the offense of conviction, due process requires that the gov-
ernment prove the facts underlying the enhancement by clear
and convincing evidence."). We reached this conclusion rely-
ing, in large part, on *United States v. Kikumura*, 918 F.2d
1084 (3d Cir. 1990). *See United States v. Valensia*, 222 F.3d
1173, 1179 (2000); *Restrepo*, 946 F.2d at 646 n.1, 661 n.12.

The Third Circuit in *Kikumura* explained that while "less
procedural protection is so clearly appropriate in the majority
of sentencing cases," where the enhancement represents the
overwhelming proportion of the punishment imposed, "a
court cannot reflexively apply the truncated procedures that
are perfectly adequate for all of the more mundane, familiar
sentencing determinations." *Kikumura*, 918 F.2d at 1100-01;
*see id.* at 1099 ("Though long recognized as a practical neces-
sity, real offense sentencing can create the potential for signif-
icant unfairness. This is so because every factual
consideration deemed relevant for sentencing purposes must
be established through a collateral, post-verdict adjudication
at which the applicable procedural protections are signifi-
cantly lower than those applicable at the trial itself."). To

---

[6]The Sixth Amendment concerns underlying *Apprendi* and its progeny
are not the same as the due process concerns implicated here. *See Booker*,
543 U.S. at 233 (noting that if advisory rather than mandatory, the use of
the Guidelines does not implicate the Sixth Amendment).

accommodate these concerns, the Third Circuit crafted a resolution, adopted by this circuit, under which a district court is required to "ratchet up certain, though not necessarily all, of the procedural protections afforded a defendant at sentencing, so as more closely to resemble those afforded at trial," by applying the clear and convincing evidence standard to sentencing factors that disproportionately impact the overall sentence. *Id.* at 1101; *see Valensia*, 222 F.3d at 1179 (discussing *Kikumura*).

[9] Although the Guidelines do not control the district court's ultimate sentence any longer, they must, as a first step, be consulted and accurately assessed. *See United States v. Jennings*, 439 F.3d 604, 606 (9th Cir. 2006) (noting that "district courts must, after *Booker*, consult the Guidelines for advice in fashioning appropriate sentences and must do so *accurately*" (emphasis added)).[7] As the concern with accuracy remains critical, so does the concern that enhancements having a drastic impact be determined with particular accuracy.

[10] We hold, accordingly, that *Booker* has no impact on the due process concerns which require that enhancements resulting in disproportionate, albeit advisory, Guidelines sentences find support in facts established by clear and convincing evidence. On remand, therefore, if the application of section 2D1.1(b)(5)(B) again results in a disproportionate sentence, the enhancement must be supported by facts established by clear and convincing evidence.

---

[7]*Booker* makes clear that its remedial fix is intended to "make the Guidelines system advisory while maintaining a *strong connection* between the sentence imposed and the offender's real conduct — a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve." 543 U.S. at 246 (emphasis added). We note that *Booker* furthers the very same interests that animated the Third Circuit in *Kikumura*. *See* 918 F.2d at 1098-1102 (discussing the problems associated with "a system that metes out punishment on the basis of a defendant's actual conduct in a particular case").

## IV.

**[11]** We vacate the imposed sentence and remand to the district court for resentencing in order that it have the opportunity to consider whether the section 2D1.1(b)(5)(B) enhancement is applicable in light of Note 20(A).

**VACATED and REMANDED.**