**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RANDALL T. TREADWELL,
*Defendant-Appellant.*

No. 08-50562

D.C. No.
3:05-cr-01570-W-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RICKY D. SLUDER,
*Defendant-Appellant.*

No. 09-50023

D.C. No.
3:05-cr-01570-W-3

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LARRY C. SATURDAY,
*Defendant-Appellant.*

No. 09-50024

D.C. No.
3:05-CR-01570-W-4

OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
November 3, 2009—Pasadena, California

Filed January 28, 2010

1673

Before: Ronald M. Gould and Carlos T. Bea, Circuit Judges, and Donald W. Molloy, District Judge.*

Opinion by Judge Gould

---

*The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

**COUNSEL**

David J. Zugman, Burcham & Zugman, San Diego, California, for defendant-appellant Ricky D. Sluder.

Jami L. Ferrara, Law Office of Jami L. Ferrara, San Diego, California, for defendant-appellant Larry C. Saturday.

Kathryn Thickstun Leff, Law Offices of Kathryn Thickstun Leff, San Diego, California, for defendant-appellant Randall T. Treadwell.

William P. Cole, Assistant U.S. Attorney, San Diego, California, for plaintiff-appellee United States of America.

**OPINION**

GOULD, Circuit Judge:

A federal jury convicted Defendants-Appellants Randall Treadwell, Ricky Sluder, and Larry Saturday (collectively

"defendants") of wire fraud and conspiracy to commit wire fraud under 18 U.S.C. §§ 371 and 1343. The charges stem from a massive four-year Ponzi scheme in which more than 1,700 investors across the United States lost over $40 million. Sluder and Saturday appeal their convictions; Treadwell, Sluder, and Saturday appeal their sentences. We disagree with the defendants on all counts. We affirm the convictions of Sluder and Saturday and the sentences of all three defendants.

# I

On September 8, 2005, Randall Treadwell, Ricky Sluder, and Larry Saturday were indicted by a federal grand jury on one count of conspiracy to commit wire fraud under 18 U.S.C. § 371 and four counts of wire fraud under 18 U.S.C. § 1343. The indictment alleged that the trio, along with their attorney, Arnulfo Acosta,[1] were involved in an extravagant four-year Ponzi scheme[2] that ultimately defrauded investors out of more than $40 million.

---

[1]Acosta pled guilty and waived his appeal rights in that agreement. He is not a party to the present appeal.

[2]The term Ponzi scheme refers to a fraudulent scheme in which, rather than paying investor returns from investment income, initial investors are paid off with new contributions from additional investors. Black's Law Dictionary 1198 (8th ed. 2004). Although this may appear to be a good deal for participants at the outset, the underlying economics mean that such a scheme must eventually collapse, when the flow of new funds can no longer support payments required on the earlier funds invested. On collapse, the investors lose their remaining investments.

Although he was not the first to dream up this type of swindle, the Ponzi scheme is named for Charles Ponzi, the head of the Securities Exchange Company, who became momentarily famous in the 1920s in Boston for selling bonds that, if held for 45 or 90 days, promised returns of 50% and 100% "on any amount invested." Mitchell Zuckoff, *Ponzi's Scheme* 175, 314 (2005). Ponzi's scheme did not pay out as promised, Ponzi's fame turned to infamy, and Ponzi was eventually arrested and prosecuted for mail fraud. *See id.* at 284-88.

Despite the apparent notoriety of Ponzi schemes, they continue to dupe investors. It has been reported that Albanian pyramid schemes netted a

Treadwell, Sluder, and Saturday were tried jointly. At trial, the government alleged that beginning in 2001, Treadwell and Sluder set up a series of investment companies, including Qwest International ("Qwest"), Wealth Builders Club ("WBC"), Learn Waterhouse, Inc. ("LWI"), and Grande Belgravia ("GB"). Between 2001 and 2005, Treadwell, Sluder, and Saturday—Saturday joining the scheme sometime near the end of 2003 or the beginning 2004—pitched these companies to prospective investors in restaurants and motel conference rooms. Their pitch was simple, though fraudulent: Temporarily "loan" money to these investment companies, they said, and in exchange you will be rewarded with very large future financial returns, and with no risk. It may seem surprising that investors would be so foolish as to fall for such a line, but they did, and in large numbers.

According to the misrepresentations made by the defendants, the loans were "zero risk," often paying returns of 50% interest per month and 2% interest compounded monthly. The defendants claimed that their companies were making investments with "the top three banks in the United States," had

---

purported $1.2 billion after the fall of Communism in the 1980s, and that a Florida church in the 1990s amassed $500 million by promising that God would double the money of pious investors. Alex Altman, *A Brief History Of: Ponzi Schemes*, TIME, Jan. 8, 2009, at 13. Lest one think Ponzi schemes are too simple and obvious to bamboozle the financially savvy, an oil-drilling swindle in the 1970s duped top executives at Pepsico, Time, and General Electric, as well as the chairman of U.S. Trust, the president of First Boston Corp., and an author of several books on Wall Street finance. *See* Donald H. Dunn, *Ponzi! The Boston Swindler* xi-xii (1975). Most recently, the 2008 collapse of Bernard "Bernie" Madoff's grandiose Ponzi scheme resulted in over $50 billion in investor losses, a 150-year prison sentence for Madoff, and numerous investor lawsuits that predictably will take years for resolution. *See, e.g.*, *Lautenberg Found. v. Madoff*, No. 09-816 (SRC), 2009 WL 2928913, at *1 (D.N.J. Sept. 9, 2009). The problems of protecting the public from Ponzi schemes are ongoing; according to the Associated Press, over 150 Ponzi schemes collapsed in 2009. Curt Anderson, *'09, The Year of the Ponzi Scam*, Newsday, Jan. 2, 2010, at A27.

"clients in twenty-nine countries," made investments guaranteed by the United States government, had invested $2 billion in a gold mine in Mexico, and were working on a billion-dollar Columbus-era "find" on the bottom of the ocean. In a meeting in October of 2004, Sluder stated that the companies were directing investments towards "humanitarian" projects, including projects benefitting "people that are hungry and . . . in various needs throughout the world." The defendants' sales pitch convinced many victims of the fraud; the government alleged, and the defendants did not dispute, that over the course of the four-year operation investors "loaned" over $50 million to the defendants' companies.

Treadwell often claimed that he had a God-given ability to make money, but in hindsight it appears that his talents lay in extracting funds from duped investors. The purported investments did not exist at all. By the time the defendants' far-reaching Ponzi scheme collapsed, more than 1,700 investors throughout the United States had lost their investments. At trial, the defendants produced no evidence to suggest that any investment profit was generated by their companies. In contrast, the government's expert testified that after analyzing the Qwest, WBC, and LWI bank records, the only sources of funds in those bank accounts were investor deposits.[3]

The government portrayed Treadwell as the mastermind of the scheme, with Sluder as his second-in-command and Saturday acting as a salesman and sales-force trainer. Evidence also suggested that as state regulators in Florida and Alabama began to investigate the scheme, Treadwell and Sluder attempted to evade legal action by moving the investment

---

[3]In particular, it is the absence of evidence of any investment of investor funds that makes "Ponzi scheme" an apt characterization of the defendants' fraud. *See, e.g.*, Dunn, *supra* note 2, at x ("What sets Ponzi schemes off from more intricate swindles is this: The money that investors put up isn't invested in anything, and the 'profits' are paid out of new money from subsequent investors.").

program offshore under the guise of a new company called "Grande Belgravia." Videotaped conversations between an FBI informant and Treadwell captured Treadwell's attempt to pay the informant in exchange for not talking to the FBI.

The defendants' response was that although they misrepresented the nature of the various corporations' earnings, the defendants always believed that their investors would eventually make money.[4] However, the jury instructions defined "intent to defraud" under 18 U.S.C. § 1343 as "an intent to deceive or cheat" and stated that it is no defense to fraud that "[the defendant] honestly holds a certain opinion or belief, [but] also knowingly makes false or fraudulent promises, representations, or promises to others." The defendants did not object to that instruction before they were convicted.

The jury convicted Treadwell and Sluder on the conspiracy count and all four counts of wire fraud as pleaded in the indictment. Saturday was convicted on the conspiracy count and three of the four wire fraud counts.

Treadwell was sentenced on December 11, 2008, to 300 months' imprisonment, followed by 3 years' supervised release and a mandatory restitution order of $44,872,152. At sentencing, the district court calculated an advisory United States Sentencing Guidelines ("Guidelines") range of 324 to 405 months. That range included a twenty-two level upward adjustment for between $20 million and $50 million in losses caused by fraud. *See* USSG § 2B1.1(b)(1)(L) (2008). It also included a two-point upward adjustment for misrepresentations that Treadwell was "acting on behalf of a charitable . . . organization," *see* USSG § 2B1.1(b)(8)(A), on the basis of Sluder's statements regarding "humanitarian" projects. Con-

---

[4]In this defense one hears echoes of Charles Ponzi himself, who argued at his sentencing hearing that he "absolutely believed that if he was not arrested that he would have paid dollar for dollar and be a millionaire standing here now." Zuckoff, *supra* note 2, at 289.

sidering the 18 U.S.C. § 3553(a) sentencing factors, the district court subsequently concluded that "protection of the public" and "deterrence" justified imposing a 300-month sentence on Treadwell. The court based its imprisonment calculations on 60 months' imprisonment for the conspiracy count, followed by four concurrent sentences of 240 months' imprisonment for each of the wire fraud counts.[5]

Sluder and Saturday were sentenced in a joint sentencing hearing on January 12, 2009. The district court calculated, for Sluder, an advisory Guidelines range of 324 to 405 months' imprisonment, and for Saturday, a range of 135 to 168 months' imprisonment. Both calculations included the same twenty-two point upward adjustment for losses from fraud between $20 million and $50 million that was imposed on Treadwell. However, in considering the 18 U.S.C. § 3553(a) factors, the district court concluded that the amount of loss had "a disproportionate effect" on Sluder's and Saturday's recommended Guidelines ranges. The court's sentencing variation for Sluder was "the equivalent" of a five-level downward departure. The variation for Saturday was "the equivalent" of a seven-level downward departure. Sluder was sentenced to 188 months' imprisonment followed by 3 years' supervised release and a mandatory restitution order of $44,872,152.38. Saturday was sentenced to 63 months' imprisonment, followed by 3 years' supervised release and a mandatory restitution order of $22,436,076.19.

All defendants timely appealed.

On appeal, Sluder and Saturday challenge their jury conviction, arguing that the jury instructions violated their Fifth

---

[5]The statutory maximum sentence for conspiracy under 18 U.S.C. § 371 is 60 months' imprisonment. The statutory maximum sentence for wire fraud under 18 U.S.C. § 1343 that does not involve "a presidentially declared major disaster" or affect "a financial institution" is 240 months' imprisonment.

Amendment due process rights because "intent to defraud" under 18 U.S.C. § 1343 requires an intent to cause an actual loss. Sluder and Saturday also appeal their sentences, arguing that: (1) the district court incorrectly calculated their Guidelines ranges by finding the amount of loss based on only a preponderance of the evidence and attributing to them the entire loss caused by the conspiracy; (2) the Ex Post Facto Clause prohibits the application of the Supreme Court's remedial holding in *United States v. Booker*, 543 U.S. 220 (2005), to their pre-*Booker* conduct; and (3) their sentences cannot be upheld as "substantively reasonable" under 18 U.S.C. § 3553(a) without reliance on judge-found facts—such as the amount of loss caused by the fraud—in violation of their Sixth Amendment jury trial right. Treadwell joins Sluder and Saturday's Sixth Amendment argument, and also argues that: (1) it was error for the district court to impose a two-point upward adjustment for misrepresentations that he was acting on behalf of a charitable organization; and (2) his sentence is substantively unreasonable under 18 U.S.C. § 3553(a).

We have jurisdiction to review Sluder and Saturday's convictions under 28 U.S.C. § 1291 and jurisdiction to review all three defendants' sentences under 18 U.S.C. § 3742. We review each of the defendants' claims in turn.

## II

We first consider Sluder and Saturday's challenge to their convictions. Sluder and Saturday argue that their Fifth Amendment due process rights were violated by jury instructions that did not define "intent to defraud" under 18 U.S.C. § 1343 to require an intent to cause a financial loss to the victims. Sluder and Saturday did not object to the jury instructions at trial, so we review those instructions for plain error. *See* Fed. R. Crim. P. 30(d), 52(b); *United States v. Crowe*, 563 F.3d 969, 972-73 (9th Cir. 2009). On plain error review, we correct an error not raised at trial only if it is plain, affects substantial rights, and "seriously affects the fairness, integrity,

or public reputation of judicial proceedings." *Id.* at 973 n.6. These requirements are not met by the facts here presented.

**[1]** According to the federal wire fraud statute, 18 U.S.C. § 1343, any person who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," is guilty of wire fraud. Conviction under § 1343 means a defendant must have intended "to defraud" his victim. *See United States v. Oren*, 893 F.2d 1057, 1061 (9th Cir. 1990). "To defraud" under § 1343 encompasses "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987); *see also United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000) ("[T]he offense's specific intent element . . . require[s] proof of intent to deprive the victim of money or property."). It means to "wrong[ ] one in his property rights by dishonest methods or schemes, and usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching." *Carpenter*, 484 U.S. at 27 (internal quotation marks omitted).

**[2]** Sluder and Saturday readily admit the district court's jury instructions were in accord with our precedents. Section 1343 requires that one specifically intend "to deprive" the victim of money or property, but one can intend to "deprive" a victim of property within the meaning of the statute without intending to cause pecuniary loss. The common understanding of the verb "to deprive" is to take away something, such as property, from another. *See* Black's Law Dictionary 473 (8th ed. 2004) (defining "deprivation" as "[a]n act of taking away"). In accordance with this understanding, we held in *United States v. Oren* that intent "to defraud" under § 1343 does not require an intent to cause a pecuniary loss to the vic-

tim. *See* 893 F.2d at 1062 (holding that even if the defendant believed that the property was worth what the victim of the fraud paid for it, the fact that the seller made a false representation to inflate the purchase price constituted "intent to defraud" under § 1343). "[The defendant]'s guilt or innocence of the crime charged is entirely independent of and unrelated to his belief of the property's value . . . . Because he has conceded that he intentionally created a false statement, it was no defense here for him to argue that he genuinely believed that the property was worth what the [victim] paid for it." *Id.*

**[3]** Similarly, the intended deprivation under § 1343 need not be a *permanent* "taking away" of money or property. One can intentionally "deprive" another of property while at the same time intending to restore it at a later date. Thus, in *United States v. Benny,* 786 F.2d 1410 (9th Cir. 1986), we upheld jury instructions that stated a good-faith intent to repay money acquired through misrepresentation is not a defense to mail fraud under 18 U.S.C. § 1341—a statute which, like § 1343, applies only to wrongdoers "having devised or intending to devise any scheme or artifice to defraud."[6] *See id.* at 1417. "While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all." *Id.*

Sluder and Saturday ask us to reconsider our precedents, arguing that the Second, Third, Fifth, and Eighth Circuits define intent to defraud under § 1343 to require deprivation with the "intent to harm," that "harm" in this case means pecuniary loss, and that those circuits' interpretation of

---

[6]We have often used precedents interpreting the federal mail fraud statute, 18 U.S.C. § 1341, to inform our interpretation of the federal wire fraud statute, 18 U.S.C. § 1343. *See, e.g.*, *United States v. Garner*, 663 F.2d 834, 838 (9th Cir. 1981); *United States v. Wolfson*, 634 F.2d 1217, 1220 (9th Cir. 1980); *United States v. Louderman*, 576 F.2d 1383, 1387 & n.3 (9th Cir. 1978) ("For guidance in construing the scope and reach of § 1343, we look to the mail fraud statute, 18 U.S.C. § 1341.").

§ 1343 is the better view. *See, e.g.*, *United States v. Edelmann*, 458 F.3d 791, 812 (8th Cir. 2006) ("The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm."); *United States v. Dupre*, 339 F. Supp. 2d 534, 539 (S.D.N.Y. 2004) ("The Government must prove that the defendant [had] a purpose of causing actual financial harm to another."), *aff'd*, 462 F.3d 131 (2d Cir. 2006); *United States v. Thomas*, 315 F.3d 190, 200 (3d Cir. 2002) ("We believe that, given the legislative intent, harm or loss to the bank must be contemplated by the wrongdoer . . . ."); *United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir. 1996) ("Intent to defraud requires an intent to (1) deceive, and (2) cause some harm to result from the deceit.").

We disagree with Sluder and Saturday's reading of the Second, Third, Fifth, and Eighth Circuits' precedents. Whether or not § 1343 requires that the deprivation involve an "intent to harm"—and we express no opinion on that issue—our present holding is entirely consistent with such a requirement. The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes "harm" by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property. *See United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) (holding that even though the defendant believed the real estate projects he misrepresented were viable, his belief "[did] not negate his intent to inflict a genuine harm on the victims by depriving them of material information necessary to determine for themselves whether to continue their development projects, thereby continuing or increasing their exposure to the risk of the projects' failure"); *United States v. Daniel,* 329 F.3d 480, 488 (6th Cir. 2003) ("We agree that the intent must be to injure or harm . . . . It is sufficient that the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken."). We can say with confidence that our analysis of "in-

tent to harm" is consistent with the analysis of at least three of the circuits relied on by defendants. *See, e.g.*, *Edelmann*, 458 F.3d at 812 (holding that a defendant's good-faith belief that he intended to repay the "loans" he procured through misrepresentation was not a defense to wire fraud); *Carlo*, 507 F.3d at 802; *United States v. Judd*, 889 F.2d 1410, 1414 (5th Cir. 1989) ("[Supreme Court precedent] is read much too broadly when it is claimed to require that mail and wire fraud convictions can be sustained only if motivated by intent to cause financial loss to another.").

To our knowledge, our precedents establishing that § 1343 does not require an intent to cause pecuniary loss are consistent with the views of all other circuits that have addressed the issue. *See, e.g.*, *Carlo*, 507 F.3d 799, 802 (2d Cir. 2007); *United States v. Hamilton*, 499 F.3d 734, 737 (7th Cir. 2007); *United States v. Daniel,* 329 F.3d 480, 488 (6th Cir. 2003)*; United States v. Bailey*, 327 F.3d 1131, 1143 (10th Cir. 2003); *United States v. Judd*, 889 F.2d 1410, 1414 (5th Cir. 1989); *United States v. Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979); *United States v. Painter*, 314 F.2d 939, 943 (4th Cir. 1963).

For example, in *United States v. Hamilton*, the defendant in a wire fraud prosecution challenged a jury instruction stating that "if money or property is obtained through knowingly false representations, the scheme to defraud is established, regardless of whether the defendant hoped, intended, or even expected that the victims would eventually be satisfied." 499 F.3d at 735. The Seventh Circuit upheld the instruction, observing as follows: "If you embezzle from your employer you are not excused just because you had an honest intention of replacing the money, maybe with interest . . . . You imposed a risk of loss on the employer—deliberately, fraudulently, and without a shadow of excuse or justification—and that is harm enough to trigger criminal liability . . . . The same principle that covers embezzlement covers [wire] fraud." *Id.* at 736-37.

Similarly, in *United States v. Daniel,* the defendant argued that he lacked the intent to defraud under § 1343 because the jury could have found either that he planned to repay the money he had obtained by misrepresentation, or alternatively that he believed in good faith that he was acting in his victim's best interests. 329 F.3d at 488. The Sixth Circuit rejected that argument. "[The defendant] contends that the intent must be to injure or harm the victim . . . . But neither law nor policy supports this approach, which would have the jury look beyond his bad conduct to his overall motives. It is sufficient that the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *Id.*

We therefore see no error in the district court's "intent to defraud" jury instructions. The district court's instructions were taken from Ninth Circuit Model Criminal Jury Instruction 3.17 and the comments appended thereto. *See United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) (upholding a jury instruction because "[i]ts charge—that intent to defraud is an intent to deceive or cheat—comes directly from Ninth Circuit Model Criminal Jury Instructions § 3.17"). That model jury instruction states that "intent to defraud is an intent to deceive or cheat," and that "a defendant's belief that the victims of the fraud will be paid in the future or will sustain no economic loss is no defense to the crime." Those instructions are consistent with applicable Supreme Court precedent. *See Carpenter*, 484 U.S. at 27. They are also consistent with the pattern jury instructions used in many other circuits.[7] *See, e.g.*, Third Circuit Model Criminal Jury Instruc-

---

[7]Although "intent to defraud" pattern jury instructions vary among the circuits, no circuit's pattern instructions limit intent to defraud in § 1343 to an "intent to cause a loss." For example, the pattern instructions in some circuits define intent to defraud as the intent to deceive or cheat "for the purpose of *either* causing some financial loss to another *or* bringing about some financial gain to oneself." First Circuit Criminal Jury Instruction 4.13 (emphasis added); *see also* Sixth Circuit Criminal Jury Instruction

tion 6.18.1341-4 ("To act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat."); Fifth Circuit Criminal Jury Instruction 2.60 ("An 'intent to defraud' means an intent to deceive or cheat someone."); Sixth Circuit Criminal Jury Instruction 10.04(3) ("A defendant does not act in good faith if, even though he honestly holds a certain opinion or belief, that defendant also knowingly makes false or fraudulent pretenses, representations, or promises to others."); Tenth Circuit Criminal Jury Instruction 2.57 ("An 'intent to defraud' means an intent to deceive or cheat someone."); Eleventh Circuit Criminal Pattern Jury Instruction 17 ("[A]n honest belief on the part of the Defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute 'good faith' as that term is used in these instructions if, in carrying out that venture, the Defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.").

**[4]** A jury found that Sluder and Saturday, through misrepresentation, intentionally deprived their victims of the opportunity to decide for themselves, on the basis of true and accurate information, whether or not to invest in companies like Qwest, WBC, and LWI. That is all that an "intent to defraud" under 18 U.S.C. § 1343 requires. There was no plain error in the jury instructions which, as a whole, fairly presented the element of intent to defraud upon which Sluder's and Saturday's wire fraud convictions depend.

### III

We next consider the defendants' challenges to the district court's calculation of their respective Guidelines ranges. A

---

10.02; Eight Circuit Criminal Jury Instruction 6.18.1341 (mail fraud); Eleventh Circuit Criminal Pattern Jury Instruction 51.1. The disjunctive terms "either . . . or" in these pattern instructions indicate that these circuits do not interpret "intent to defraud" under § 1343 to require the intent to cause a loss.

district court must begin a sentencing proceeding by calculating the applicable Guidelines range. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The Guidelines are "the starting point and the initial benchmark" for determining an appropriate sentence under 18 U.S.C. § 3553(a), and they are "to be kept in mind throughout the process." *Id.* (internal citations omitted). Failure to calculate correctly the Guidelines range therefore constitutes reversible error, as we explained explicitly in *Carty. See id.* at 993; *see also United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006).

We review the district court's interpretation of the Guidelines de novo, the district court's application of the Guidelines to the facts of the case for abuse of discretion, and the district court's factual findings for clear error. *United States v. Lambert*, 498 F.3d 963, 966 (9th Cir. 2007). It is an abuse of discretion for a district court to apply the Guidelines to the facts in a way that is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

## A

Sluder and Saturday first argue that the district court used the incorrect standard of proof when it found, by a preponderance of the evidence, the amount of loss for which they were individually responsible. They contend due process required clear and convincing proof of the amount of loss. The standard of proof required by due process is an issue of law that we review de novo. *United States v. Berger*, 587 F.3d 1038, 1042 (9th Cir. 2009).

The Guidelines require a district court to calculate the amount of loss caused by fraud, and correlate the severity of the sentence to the amount of the loss. *See* USSG § 2B1.1(b)(1). "[T]he sentences of defendants convicted of federal offenses should reflect the nature and magnitude of

the loss caused or intended by their crimes. . . . [L]oss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level . . . ." *Id.* comment (backg'd.). Ordinarily, a district court uses a preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud. *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008). However, "where an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a 'clear and convincing' standard." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).

**[5]** Our requirement that certain sentencing facts be found by clear and convincing evidence is to ensure that criminal defendants receive adequate due process. *See United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006). Thus, where a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct, due process may require clear and convincing evidence of that conduct. *See United States v. Harrison-Philpot*, 978 F.2d 1520, 1523 (9th Cir. 1992). We impose this requirement to ensure that legislatures "cannot evade [the constitutionally required standard of proof] by reclassifying an element of a crime as a sentencing factor," *id.*, thereby depriving a defendant of important criminal procedural protections. "[W]here the enhancement represents the overwhelming proportion of the punishment imposed, a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations." *Staten*, 466 F.3d at 720 (internal quotation marks omitted). "To accommodate these concerns . . . a district court is required to 'ratchet up certain, though not necessarily all, of the procedural protections afforded a defendant at sentencing, so as more closely to resemble those afforded at trial, by applying the clear and convincing evidence standard . . . ." *Id.* (internal quotation marks omitted).

Whether a sentencing enhancement causes a disproportionate impact warranting clear and convincing proof necessitates a look at the "totality of the circumstances." *United States v. Jordan*, 256 F.3d 922, 928 (9th Cir. 2001). Circumstances considered include (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence. *Id.*

[6] Sluder and Saturday argue that the amount of loss found by the district court—which resulted in a twenty-two level increase in their Guidelines ranges—required clear and convincing evidence because it had a "disproportionate impact" on their sentences.[8] We disagree. We have repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence. *See, e.g.*, *Berger*, 587 F.3d at 1047-49 ("[A] number of our cases squarely address the factual situation presented here. Those cases involve a defendant's fraudulent conduct where sentencing enhancements for financial loss are

---

[8]The district court calculated that Sluder's overall offense level was forty-one and Saturday's was thirty-three. These offense levels correspond to sentencing ranges of 324 to 405 months and 135 to 168 months imprisonment, respectively. *See* USSG § 5 Pt. A. Without the twenty-two level enhancement, Sluder's sentencing range would have been 30 to 37 months, and Saturday's range would have been 8 to 14 months. The twenty-two level loss enhancement therefore accounts for the substantial majority of the sentences imposed on both Sluder and Saturday.

based on the extent of the fraud conspiracy. They hold that facts underlying the disputed enhancements need only be found by a preponderance of the evidence."); *Armstead*, 552 F.3d at 777 ("[S]entencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof."); *United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003); *Harrison-Philpot*, 978 F.2d at 1523.

[7] Although "disproportionate impact" *may* require a clear and convincing standard of proof, the touchstone underlying this heightened burden of proof has always been due process. *See Staten*, 466 F.3d at 717. Those due process concerns are absent here. The jury convicted Sluder and Saturday of conspiracy to commit wire fraud. The district court's amount-of-loss finding was based on the evidence presented at trial on the conspiracy charge, and Sluder and Saturday cannot contend that they were denied adequate procedural protection in contesting that evidence. "[T]he distinction between a quantity determination and uncharged criminal conduct places [a defendant convicted of conspiracy] on a fundamentally different plane" than a defendant who has not been convicted of conspiracy. *Harrison-Philpot*, 978 F.2d at 1523.

[8] An analysis of the "totality of the circumstances" of Sluder's and Saturday's loss enhancement underscores our point. Sluder's and Saturday's sentences, even after the loss enhancement, fall within the maximum sentence authorized for the crimes alleged in the indictment. The loss enhancement neither negates the presumption of innocence nor alters the burden of proof for wire fraud or conspiracy to commit wire fraud. Nor does it hold Sluder and Saturday responsible for any offenses for which they have not been convicted by a jury. *Cf. Nijhawan v. Holder*, 129 S. Ct. 2294, 2297-98 (2009) (holding that, in the context of federal immigration law, the amount of loss to the victim of fraud or deceit "does not refer to an element of the fraud or deceit," but rather refers to "the particular circumstances in which an offender committed" fraud or deceit). The loss enhancement is based

on a conspiracy conviction, and Sluder and Saturday had ample opportunity at trial to challenge the government's evidence of the extent of losses caused by the conspiracy. The only circumstance weighing in favor of a heightened standard of proof is the size of the loss enhancement itself. The enhancement was large, but that alone does not raise the due process concerns that urge "clear and convincing" proof. We hold that "preponderance of the evidence" was the appropriate standard of proof for determining the amount of loss caused by the conspiracy.

**B**

Sluder and Saturday next argue that the district court incorrectly attributed to them the entire loss caused by the conspiracy, failing to determine the scope of each defendant's "jointly undertaken" criminal activity and the amount of loss "reasonably foreseeable" to each defendant. They contend that, because Sluder and Saturday received a substantially smaller proportion of the conspiracy's profits than Treadwell and Acosta, this indicates that the scope of their "joint undertaking" was correspondingly limited. Sluder and Saturday further argue that the full amount of loss caused by the fraud was not "reasonably foreseeable" to them because they do not have a background in finance and therefore believed Treadwell's claims that he had a God-given gift for making money.

Guidelines § 2B1.1 requires the district court to calculate the amount of loss attributable to an individual defendant's conduct in perpetrating a fraud. Where the amount of loss is the result of "jointly undertaken criminal activity"—such as a conspiracy—the relevant amount of loss must be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction." USSG § 1B1.3(a)(1)(B). The application notes to § 1B1.3 elaborate on this point:

>Because a count may be worded broadly and include
>the conduct of many participants over a period of
>time, the scope of the criminal activity jointly
>undertaken by the defendant . . . *is not necessarily
>the same as the scope of the entire conspiracy* . . . .
>In order to determine the defendant's accountability
>for the conduct of others . . . the court must first
>determine the scope of the criminal activity the par-
>ticular defendant agreed to jointly undertake (*i.e.*, the
>scope of the specific conduct and objectives
>embraced by the defendant's agreement). The con-
>duct of others that was both in furtherance of, and
>reasonably foreseeable in connection with, the crimi-
>nal activity jointly undertaken by the defendant is
>relevant conduct under this provision.

*Id.* § 1B1.3 cmt. n.2 (emphasis added). In accordance with this provision, we have held that a district court may not auto-matically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agree-ment with his co-conspirators and was reasonably foreseeable to the defendant. *See, e.g.*, *Riley*, 335 F.3d at 928; *United States v. Ladum*, 141 F.3d 1328, 1346 (9th Cir. 1998); *see also United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003) (amount of drugs attributable to defendant's participa-tion in drug conspiracy); *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148 (9th Cir. 1999) ("Under the Guidelines each conspirator . . . is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspira-tors.").

However, to comply with USSG § 1B1.3(a)(1)(B), a dis-trict court is not required to proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy and to then make an individualized determination whether or

not each item was within the scope of the defendant's "joint undertaking" and was "reasonably foreseeable" to that defendant. Section 1B1.3(a) is a general provision that prescribes the relevant range of conduct a district court should consider when calculating the applicable Guidelines range, and must be interpreted in conjunction with the specific guideline being applied. *See* USSG § 1B1.3 cmt. (backg'd) ("Subsection (a) establishes a rule of construction by specifying, in the absence of more explicit instructions in the context of a specific guideline, the range of conduct that is relevant to determining the applicable offense level . . . ."). "The provisions of § 1B1.3 are written broadly to provide sentencing judges maximum discretion, allowing flexibility in their application to a variety of crimes and circumstances. It is the provisions' interactions with numerous other guidelines, however, that determine what conduct is 'relevant' to each specific guideline . . . ." *United States v. Cruz-Gramajo*, 570 F.3d 1162, 1171 (9th Cir. 2009).

[9] In this case, the applicable guideline for calculating the amount of loss caused by fraud, § 2B1.1, requires only that a district court "make a reasonable estimate of the loss." USSG § 2B1.1 cmt. n.3(C). "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense," meaning monetary harm "that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense. *Id.* cmt. n.3(A)(i), (iv). In making this estimate, the district court must consider "available information . . . as appropriate and practicable under the circumstances" including "general factors, such as the scope and duration of the offense and revenues generated by similar operations." *Id.* cmt. n.3(C). Given that "reasonable foreseeability" and the "scope and duration of the offense" are concepts incorporated into the estimate of loss itself under § 2B1.1, we interpret § 1B1.3 as a *limit* on what conduct may be considered in making the corresponding loss estimate for a conspiracy conviction, not as a requirement that the district court make additional, detailed findings in the record regard-

ing specific amounts of loss attributable to each defendant. *See* USSG § 1B1.3(a) ("Unless otherwise specified, . . . specific offense characteristics . . . shall be determined on the basis of the following . . . ."); *Cruz-Gramajo*, 570 F.3d at 1172 ("Section 1B1.3 does not create a scope of relevant conduct that has independent significance. Rather, it merely defines the scope of conduct considered in determining the base offense level, specific offense characteristics, cross references, and adjustments involved.").

**[10]** For losses resulting from a fraudulent conspiracy as extensive and long-lasting as the present Ponzi scheme—and for which Sluder and Saturday were both convicted—all that § 1B1.3 requires is that, in the context of calculating the amount of loss under § 2B1.1, the district court make factual determinations establishing the scope of each defendant's joint undertaking and the amount of losses reasonably foreseeable to each defendant. *See Riley*, 335 F.3d at 928 (holding that the district court made sufficient factual findings and adequately determined the scope of defendant's participation in a conspiracy under § 1B1.3 even though "the district court did not expressly determine the scope of [the defendant's] participation"). To require anything greater would make criminal sentencing in cases like this unduly detailed, and given our deferential review of the district court's estimate of the amount of loss, would serve little purpose. *See* USSG § 2B1.1 cmt. n.3(C) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference.").

We are satisfied that the district court correctly found the scope of relevant conduct under § 1B1.3 in attributing losses to Sluder and Saturday as a result of their conspiracy convictions.[9] Contrary to the defendants' arguments, the district

---

[9]To the extent that any of the district court's responses to objections at sentencing might be misconstrued as erroneously stating that the Guide-

court did *not* hold both Sluder and Saturday responsible for all losses caused by the conspiracy. Rather, it specifically found that Saturday's responsibility for the "joint undertaking" was less than either Sluder's or Treadwell's and that it was not automatically coextensive with the amount of time Saturday was involved in the conspiracy. The trial court specifically limited Saturday's responsibility for losses to the period during which he was involved in the conspiracy, beginning "sometime either in late 2003 or early 2004." It made specific findings that at least $38 million was fraudulently obtained by the conspiracy during Saturday's participation in the scheme, but ultimately attributed to Saturday only $22 million of that $38 million. The district court specifically found that Saturday was "responsible for half the loss" because he represented himself as "a founder of LWI," participated in "senior member representative conference calls" pumping up the nationwide sales force, gave "sales advice," and traveled throughout the country for various presentations. The trial court specifically addressed forseeability, finding that "with regard to the amount of loss it probably wasn't reasonably foreseeable to [Saturday] that the amount of loss was as great. However, from the evidence it was reasonably foreseeable to him that others were involved and others were getting money from investors." In Sluder's case, the district court held him responsible for all $44 million in losses caused by the conspiracy only after finding that Sluder was "involved in this conspiracy, basically, from start to finish," that Sluder "was the president" of Qwest International and that Sluder declared he and Treadwell "were the owners of LWI," and that Sluder "was a self-described leader, or manager, or supervisor of the

lines do not require the court to find the losses "reasonably foreseeable" to defendants that were within the scope of their individual "joint undertaking," we are satisfied upon review of the record as a whole that the district understood its obligation under the Guidelines and carried it out correctly. *Cf. Carty*, 520 F.3d at 994 ("To the extent the sentencing judge's initial characterization was inopportune . . . the court corrected itself. In actuality, the judge treated the Guidelines range as a baseline, and moved from there to tailor a sentence to the individualized offense . . . .").

scheme."[10] The judge specifically found that "there certainly is enough evidence to show that [Sluder] was aware of what was going on during the space of the conspiracy," and that Sluder's assertion "[that] the number of victims was not reasonably foreseeable is contrary to the evidence." We are satisfied that the district court found the scope of the "joint undertaking" and losses "reasonably foreseeable" to Sluder and Saturday according to the requirements of § 1B1.3.

Moreover, given the abundance of evidence in the record establishing Sluder and Saturday's substantial involvement in the conspiracy, the district court's findings regarding the scope of each defendant's "joint undertaking" and losses "reasonably foreseeable" to each defendant were not clearly erroneous. Although a defendant's comparative profits from a criminal scheme are relevant in determining the scope of what the defendant agreed to participate in, they are not dispositive. For example, in the context of a fraudulent telemarketing scheme, telemarketers can be held responsible for the money fraudulently obtained by other participants in the scheme, even if they received only a fixed salary. *See United States v. Blitz*, 151 F.3d 1002, 1013 (9th Cir. 1998). In *Blitz*, we held that the scope of a joint undertaking for sentencing purposes depended on whether the telemarketers "worked together," "relied on one another to make a sale," attended the same salesmeetings, and "depended on the success of the . . . operation as a whole for their financial compensation." *Id.*; *see also United States v. Studley,* 47 F.3d 569, 576 (2d Cir. 1995) (considering factors including whether or not the defendant helped "design or develop" the scam, "worked in any way to further the scheme outside of his sales efforts," "furthered the objectives of the operation as a whole," was paid on a "pure commission basis" as opposed to receiving "profits of the

---

[10]In fact, the district court imposed a two-level upward adjustment under the Guidelines—an adjustment that Sluder does not contest—for Sluder's "aggravated role" in the conspiracy.

overall operation," and "assisted other representatives with their sales").

**[11]** Here, there was ample evidence in the record to support the district court's findings. Both defendants described themselves as "founders" of the investment companies they were asking investors to support with funds. Both defendants led conference calls with the companies' nationwide sales force. Both defendants traveled around the country selling their companies' investment strategy. Both defendants misrepresented the investments made by their companies. And both defendants profited from the mutual efforts of their co-conspirators in selling non-existent investments. It was therefore not clearly erroneous for the district court to hold Sluder and Saturday responsible for losses caused by other participants in the conspiracy, whatever Sluder and Saturday's ultimate payout might have been. *See Blitz*, 151 F.3d at 1013. While Sluder and Saturday may contend that they were not aware of the conspiracy's fraudulent activity, the district court was not required to adopt that contention where evidence in the record suggested just the contrary. *See id.* at 1013-14 ("[The defendants] claim that the district court erred when it held them responsible for loss caused during the entire period of their employment at Nortay because, they say, they did not have knowledge of fraud during that entire period. . . . We find no merit in their arguments. There was ample evidence that Nortay was a fraud from start to finish and that each of the Telemarketers knew that from start to finish.").

In sum, we hold that the district court did not err in attributing $22 million in losses to Saturday and $44 million in losses to Sluder in accordance with USSG § 2B1.1(b).

## C

Treadwell argues that the district court erred by imposing a two-level upward adjustment to his Guidelines range because he misrepresented that he was acting on behalf of a

charitable organization. The district court held Treadwell responsible for Sluder's statements to potential investors that "some of the programs that we're involved in, a certain percentage of the returns that we do uh, gain from those projects do have to be returned into humanitarian needs," and "just being able to see the benefits, to be able to see people that are hungry and, and in, in various needs throughout the world. To know that we are benefitting . . . . Uh, we are able to benefit them through what we are doing."[11] Treadwell argues that the "humanitarian theme" of Sluder's solicitations does not constitute "acting on behalf of a charitable organization" within the plain meaning of the enhancement, because: (1) Treadwell's investment companies were for-profit companies, not "charitable organizations," and Sluder did not name any specific charitable organizations in which the for-profit companies were investing, and (2) Sluder did not claim to be acting as an agent or representative of any charitable organization. We review the district court's interpretation of the Guidelines de novo, and the application of the Guidelines to Sluder's misrepresentations for abuse of discretion. *See Lambert*, 498 F.3d at 966.

[12] Guidelines § 2B1.1(b)(8)(A) requires district courts to impose a two-level upward adjustment for frauds that involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization." The section applies "in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable . . . organization." *Id.* cmt. n.7(B). As explained in the Guidelines commentary, the purpose of this enhancement is to punish defendants who take advantage of "the generosity and charitable motives of victims." *Id.* cmt. (backg'd). "Taking advantage of a victim's

---

[11]The district court attributed Sluder's statements to Treadwell on the basis of Treadwell's leadership role and corresponding accountability for the statements of his subordinates. Treadwell does not challenge that attribution on appeal.

self-interest does not mitigate the seriousness of fraudulent conduct; rather, defendants who exploit victims' charitable impulses . . . create particular social harm." *Id.* Stated another way, this guideline is aimed at enhancing punishment for those who prey upon and exploit a person's tendency to be humanitarian.

Treadwell admits that he and Sluder's purpose in describing their companies' investments as "humanitarian" was to entice investors to loan money on the basis of "generosity and charitable motives" within the meaning of the Guidelines commentary. Guidelines commentary is authoritative in interpreting the text of a guideline "unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *United States v. Alvarez-Hernandez*, 478 F.3d 1060, 1063-64 (9th Cir. 2007). The only issue on appeal, therefore, is whether applying the enhancement to Sluder's misrepresentations in accordance with the purpose stated in the Guidelines commentary is "inconsistent with, or a plainly erroneous reading of" the text of § 2B1.1(b)(8)(A) itself. "When commentary and the [g]uideline it interprets are inconsistent so that following one will violate the dictates of the other, the Sentencing Reform Act itself commands compliance with the guideline." *United States v. Rising Sun*, 522 F.3d 989, 996 (9th Cir. 2008) (internal quotation marks omitted).

We use traditional rules of statutory construction when interpreting the text of the Guidelines. *United States v. Gonzalez*, 262 F.3d 867, 869 (9th Cir. 2001) (per curiam). This includes traditional canons of statutory construction. *United States v. Soberanes*, 318 F.3d 959, 964 n.4 (9th Cir. 2003). If the text of a guideline is unambiguous, its plain meaning controls. *Gonzalez*, 262 F.3d at 869. We interpret the terms of statutes using their settled common-law meanings unless the statute dictates otherwise. *United States v. Nash*, 115 F.3d 1431, 1436 (9th Cir. 1997) (quoting *United States v. Wells*, 519 U.S. 482, 491 (1997)). However, when we look to the

plain language of a statute to interpret its meaning, "we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *Hanford Downwinders Coal., Inc. v. Dowdle*, 71 F.3d 1469, 1475 (9th Cir. 1995).

We are aware of no other circuit court decision resolving the precise issue presented here. Most of the circuit court cases interpreting USSG § 2B1.1(b)(8)(A) involve defendants misrepresenting that they were acting as direct agents of specific charities. *See, e.g.*, *United States v. Reasor*, 541 F.3d 366 (5th Cir. 2008) (agent of church); *Lambert*, 498 F.3d at 965 (agent of indian tribe's education department); *United States v. Wiant*, 314 F.3d 826 (6th Cir. 2003) (agent of American Cancer Society of Ohio); *United States v. Aramony*, 166 F.3d 655 (4th Cir. 1999) (agent of United Way of America); *United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998) (agent of "New Concepts in Philanthropy Program"); *United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995) (president of a non-profit corporation). In a closely analogous case, *United States v. Edelmann*, 458 F.3d 791 (8th Cir. 2006), the Eighth Circuit upheld a sentencing enhancement where a defendant had solicited "bridge loans" to pay the operating expenses of her business. *Id.* at 798-801, 815. The Eight Circuit held that evidence that the defendant had misrepresented her business as "a non-profit, humanitarian project providing legal services to indigent criminal defendants," and that some of the money "would be used for humanitarian projects" was sufficient to sustain the enhancement. *See id.* at 815. The Eighth Circuit also concluded that the enhancement was appropriate even though the defendant had also promised future "high returns" to lenders in exchange for the bridge loans. *Id.* We hesitate to adopt a rule that would diverge from the sensible approach taken by the Eighth Circuit in *Edelmann*.

**[13]** We hold that the district court did not err in applying the two-level upward adjustment to Treadwell on the basis of Sluder's misrepresentations. It is not necessary to name a spe-

cific charitable organization, or to allude to an unnamed organization as a recipient, to misrepresent that one is "acting on behalf of" such an organization for purposes of USSG § 2B1.1(b)(8)(A). *Cf. Edelmann*, 458 F.3d at 815 (upholding application of enhancement to defendant who had sought loans for her business and represented that "part of [the] money would be used for humanitarian projects"). Reading the words "charitable organization" in the context of the provision as a whole, it is clear that the emphasis of the provision is on the character of the misrepresentation made, not the specific words used. It is well-settled that a misrepresentation can be inferred from conduct as well as from words. *See, e.g.*, *Nash*, 115 F.3d at 1436 ("[A] representation has long been held to consist of words, made orally or in writing, or other conduct manifesting to another the existence of a material present or past fact." (quoting *United States v. Bonnett*, 877 F.2d 1450, 1456 (10th Cir. 1989))). It is sufficient for purposes of § 2B1.1(b)(8)(A) that the defendant plainly intended victims to draw the inference that he or she was "acting on behalf of a charitable organization." Were it otherwise, a creative defendant could easily evade the spirit and purpose of the provision. *Cf. United States v. Ferrera*, 107 F.3d 537, 541 (7th Cir. 1997) ("[A]s a practical matter, these examples [in the Guidelines commentary] could not be exhaustive, as the devious mind would easily escape that limited net."). Treadwell and Sluder solicited loans while representing that the money would be invested, in part, in projects serving humanitarian aims and helping people "in various needs throughout the world." It was likely that if a part of the funds would be used for humanitarian aims, those aims would necessarily be advanced by some charitable organization pursuing them. The language calculatingly used by defendants to extract funds must have naturally given investors the impression that charitable organizations were involved. Accordingly, it was not an abuse of discretion for the district court to apply the enhancement under § 2B1.1(b)(8)(A) because these statements were

intended to lead victims to infer the involvement of a "charitable organization."

Nor does it matter that Treadwell and Sluder were foisting fraudulent for-profit investments on their unwitting victims, and that their victims may have been motivated by their own pecuniary gain, rather than by charitable motives. The text of § 2B1.1(b)(8)(A) requires only that the offense "involve" a misrepresentation about charities, not that the investors be misled or otherwise motivated by the misrepresentation. *See Lambert*, 498 F.3d at 971 ("[A] defendant's exploitation of his victim's charitable impulses is not required."). "Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct." USSG § 2B1.1 cmt. (backg'd); *see also Ferrera*, 107 F.3d at 541 ("[T]hat the victims may have been motivated, in part, by self-interest does not mitigate the seriousness of [defendant's] conduct. . . . Rather, the focus of our inquiry must be on the defendant's motivation for making the prohibited misrepresentation.").

**[14]** Finally, we conclude that the term "acting on behalf of" does not require acting as a direct representative or agent of a charity. "On behalf of" can be used either to mean an "agent or representative of," or to mean "in the interest or for the benefit of." *Bryan A. Garner, Garner's Modern American Usage* 94 (3d ed. 2009); *see also United States v. Romero*, 293 F.3d 1120, 1126 (9th Cir. 2002) (discussing the term "on behalf of" and determining that under the sentencing enhancement it can mean either acting in a representative capacity or acting "in the interest of" a charity). Although the text of the guideline itself is ambiguous, it is clear from the Guidelines commentary that both usages of "on behalf of" can satisfy the enhancement.[12] *See* USSG § 2B1.1 cmt.7(B) ("[The enhance-

---

[12]Treadwell argues that the enhancement should be interpreted in light of the common "theme" of the commentary's three examples, which all involve defendants acting as representatives or agents of charitable organizations. We need not determine whether Treadwell's interpretation of the

ment] applies in any case in which the defendant represented that the defendant was acting *to obtain a benefit* on behalf of a charitable . . . organization." (emphasis added)); *see also Romero*, 293 F.3d at 1126. One can act to "obtain a benefit" for a charitable organization without being that organization's representative or agent. For example, an unaffiliated fundraiser for a charitable organization acts "to obtain a benefit" for the organization and in the "interests of" the organization and is within the purview of the enhancement. *See* USSG § 2B1.1 cmt. n.7(B)(i) (example). For the purposes of "acting on behalf of" under § 2B1.1(b)(8)(A), it was sufficient that Sluder represented that loans to the investment companies would benefit humanitarian projects and therefore be "in the interests of" those projects.

**[15]** In sum, we hold that the district court did not abuse its discretion in finding that Treadwell and Sluder's appeal to their victims' charitable motives constitutes "a misrepresentation that the defendant was acting on behalf of a charitable . . . organization" for purposes of USSG § 2B1.1(b)(8)(A). *Following Edelmann*, we conclude that the facts are adequate to support the enhancement.

## IV

We next consider Treadwell's argument that the district court procedurally erred and imposed a substantively unreasonable sentence under 18 U.S.C. § 3553(a). Under § 3553(a), a district court's "overarching statutory charge" is to impose a sentence "sufficient, but not greater than necessary to reflect

---

examples is correct, because we have previously held, along with the majority of other circuits, that the examples "are not intended as an exhaustive list of covered conduct and do not preclude application of the enhancement in other situations." *Lambert*, 498 F.3d at 971 (surveying the circuits and rejecting defendant's argument that the guideline requires "exploitation of a charitable impulse" even though all examples in the commentary involve such an exploitation).

the seriousness of the offense, promote respect for the law, and provide for just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (internal quotation marks deleted). In exercising its sentencing discretion, the district court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," the applicable sentencing range under the Guidelines, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1), (2)(A)(3)-(7).

On appeal, we review the ultimate sentence imposed under § 3553(a) for procedural error and "substantive reasonableness." *Carty*, 520 F.3d at 993. It is procedural error for the district court to "fail to consider the 3553(a) factors" or "to choose a sentence based on clearly erroneous facts." *Id.* "Substantive reasonableness" review is equivalent to review for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46 (2007). In determining substantive reasonableness, we consider the totality of the circumstances, and presume neither that a non-Guidelines sentence is unreasonable nor that a within-Guidelines sentence is reasonable. *Carty*, 520 F.3d at 993.

Treadwell argues that the district court made five procedural or substantive errors in imposing his sentence under 18 U.S.C. § 3553(a): (1) ignoring or insufficiently explaining its reasons for rejecting Treadwell's request for a variance on the basis of his personal history and characteristics; (2) creating an unwarranted sentencing disparity by imposing a sentence similar to or greater than the sentences of several high-profile white-collar criminals who were responsible for substantially greater financial losses; (3) failing adequately to account for the need to provide restitution under § 3553(a)(7); (4) failing

to consider § 3553(a) factors other than § 3553(a)(2)(B) (deterrence) and § 3553(a)(2)(C) (protecting the public); and (5) rigidly applying the now-advisory Guidelines in violation of their advisory character as established in the Supreme Court's opinions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). We disagree on all counts. We hold that the district court's imposition of Treadwell's sentence under § 3533(a) was procedurally correct and substantively reasonable. We review each of Treadwell's arguments in turn.

## A

Treadwell argues that the district court abused its discretion by failing to apply a downward variance for his personal history and characteristics because he "has no criminal record to speak of," comes from "humble beginnings," is a "naive man of low average intelligence who had no education or training in the area of finance," has "several school-aged children," and has "an ailing father suffering from Alzheimer's disease and an elderly mother with coronary disease." Treadwell also argues that the district court procedurally erred by "not even attempt[ing] to address these sympathetic and even mitigating circumstances or explain why the offense conduct or any other factor outweighs" them.

The district court did not commit procedural error under § 3553(a) in evaluating and rejecting Treadwell's variance request. A district court need not explain its reasons in detail where "context and the record make clear [what] reasoning underlies the judge's conclusion." *Rita v. United States*, 551 U.S. 338, 359 (2007). In *Carty*, we held that a district court did not procedurally err although it stated *no* reasons for the sentence imposed:

> Although the judge gave no explicit reasons for [the sentence imposed], the arguments were straight-forward and uncomplicated . . . .

[T]he district judge had presided over Carty's trial. He reviewed the PSR and the parties' submissions that discussed applicability of § 3553(a) factors; and he listened to testimony adduced at the sentencing hearing and to argument by both parties. The judge acknowledged Carty's specially strong family support and the impact that prolonged incarceration would have. Based on all these factors, the judge imposed the sentence. The sentence was within, but at the low end of, the Guidelines range. "[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation."

520 F.3d at 995. We see no material difference between *Carty* and Treadwell's case. The district judge presided over Treadwell's trial. He read the Presentence Report and the parties' sentencing submissions. He listened to the arguments of Treadwell's counsel describing Treadwell's psychological evaluation and background, as well as a lengthy statement by Treadwell discussing his family and personal background. The district judge expressly ruled on Treadwell's arguments for a variance on the basis of his mental condition and family circumstances, noting that a variance for Treadwell's mental condition was not justified because the doctor's report indicated only that he had "a personality disorder." Nothing more is procedurally required. *See Rita*, 551 U.S. at 359 ("Where a matter is as conceptually simple as in the case at hand and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively.").

Nor did district court abuse its discretion when it declined to grant Treadwell's request for a downward variance. "In determining substantive reasonableness, we are to consider the totality of the circumstances . . . . We may not reverse just because we think a different sentence is appropriate." *Carty*, 520 F.3d at 993. In *Carty*, the defendant argued that the court

erred by ignoring or failing to provide sufficient reasons for rejecting his request for a downward variance under § 3553(a) on the basis of the following: the defendant had no prior criminal record, was the breadwinner for his family, had an underprivileged upbringing, had diminished capacity to understand the world around him, had parents who would likely not be alive when he was released from prison, and had sons who would be left without his guidance and support. *Id.* at 990. We held that the district court's refusal to grant a downward variance was not an abuse of discretion. *Id.* at 996.

**[16]** There are substantial similarities between Treadwell's case and our decision in *Carty*. Treadwell's arguments for a downward variance are strikingly similar to those raised by Carty, and nothing about Treadwell's background or personal characteristics—from his lack of prior criminal history to his school-aged children and ailing parents—suggests that his position is so unique that it makes the district court's refusal to vary his sentence downward "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1263; *cf. United States v. Carter*, 560 F.3d 1107, 1121-22 (9th Cir. 2009) (observing that a defendant's prior history and circumstances must be so "atypical as to put [the defendant] outside the 'minerun of roughly similar' cases considered by the Sentencing Commission in formulating the Guidelines").

**B**

Treadwell next argues that his 300-month sentence creates an unwarranted sentencing disparity under 18 U.S.C. § 3553(a)(6) because it is similar to the sentences of Bernard Ebbers and Jeffrey Skilling—each accused of billion-dollar frauds—and is substantially longer than the sentence of John Rigas, who was accused of a $200 million fraud. Treadwell argues that this constitutes an abuse of discretion because the frauds Ebbers, Skilling, and Rigas were convicted of were

highly publicized and involved substantially more money than Treadwell's fraud. We disagree.

Avoiding sentencing disparity on the basis of easily quantifiable values like amount of loss is a factor that the Guidelines are uniquely well-suited to accomplish. *See Rita*, 551 U.S. at 349 ("The Sentencing Commission examined tens of thousands of sentences . . . to fulfill [its] statutory mandate."). "[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Sentencing Guidelines ranges. Since the district judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall*, 552 U.S. at 54. In particular, the Sentencing Commission has expressly concluded that in the case of fraud, "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under [§ 2B1.1]." USSG § 2B1.1 cmt. (backg'd).

Treadwell does not dispute that the district judge correctly calculated his upward adjustment according to the Guidelines on the basis of the amount of loss caused by the fraud. Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no "unwarranted disparity" between Treadwell and other offenders convicted of similar frauds. *See Gall*, 552 U.S. at 54.

**[17]** Nor does it matter for the purposes of § 3553(a) that Treadwell can point to a specific criminal defendant, like Rigas, who may have received a lighter sentence for a different fraud. A district court considers the § 3553(a) factors to tailor a sentence to the specific characteristics of the offense and the defendant. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." *Id.* at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). The mere fact that Treadwell can point to a defendant convicted at a different time of a different fraud and sentenced to a term of imprisonment shorter than Treadwell's does not create an "unwarranted" sentencing disparity. For one thing, we aren't presented with the records in the cases on which Treadwell relies when he argues that other fraud defendants got off better than him. Moreover, sentencing disparity is only one factor a court considers in crafting an individualized sentence under § 3553(a). *See United States v. Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006) ("Even if this [sentencing] disparity were assumed to be unwarranted, however, that factor alone would not render Appellants' sentences unreasonable; the need to avoid unwarranted sentencing disparities is only one factor a district court is to consider in imposing a sentence."). A district court need not, and, as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before. Too many factors dictate the exercise of sound sentencing discretion in a particular case to make the inquiry Treadwell urges helpful or even feasible. *See* Wayne R. LaFave et al., Criminal Procedure § 26.3(a) (5th ed. 2009) ("Deterrence, incapacitation, and even retribution may require that a judge draw distinctions between offenders who commit the same crime."). In accordance with § 3553(a) the district court correctly calculated the Guidelines range and considered the disparity between Treadwell's sentence and the sentences of his co-defendants. It did not abuse its discretion in so doing.

## C

**[18]** Treadwell next argues that the district court abused its discretion by setting a "staggering" amount of restitution but imposing a prison sentence that "assure[s] restitution would never be paid." According to Treadwell's reasoning, the greater the amount of loss, the shorter the prison sentence should be, so that the defendant can begin repaying the vic-

tims sooner. This argument borders on frivolous. "Restitution is desirable but so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006). It would be a strange rule if those defendants who had defrauded large numbers of victims leading to large fraud losses were to receive light sentences in order to facilitate their unrestrained work towards restitution. The possibility of a wrongdoer making restitution is, after all, only one factor that a district court must weigh in balancing sentencing considerations. Here, the district court did not abuse its discretion when it denied Treadwell a shorter prison sentence than that warranted by other elements in the sentencing calculus merely so he could begin paying restitution sooner. The district court also had to consider, for example, that if not incarcerated, Treadwell might resume fraudulent activities sooner, and might harm new victims sooner. The severity and scope of Treadwell's fraud, taking more than $40 million from investors, justified giving significant weight to specific deterrence and to protection of the public. In the circumstances here, there was no abuse of discretion in sentencing Treadwell in a way that did not facilitate his purported interest in working freely without incarceration so that he might be able to repay his victims.

## D

Treadwell argues that the district court abused its discretion by "fail[ing] to address any other § 3553(a) factor [besides deterrence and protection of the public] and fail[ing] to provide explanation or justification as to why" those two factors are the most important. We again disagree.

"The district court need not tick off each of the § 3553(a) factors to show that it has considered them. We assume that district judges know the law and understand their obligation

to consider all of the § 3553(a) factors . . . ." *Carty*, 520 F.3d at 992. The mere fact that a district court does not affirmatively state each § 3553(a) factor does not require us to assume that the district court did not consider those factors. *See id.* at 995-96; *United States v. Corona-Verbera*, 509 F.3d 1105, 1120 (9th Cir. 2007) ("To comply with the requirements of *Booker* . . . does not necessitate a specific articulation of each [§ 3553(a)] factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence."). Instead, we look to the record to determine whether the sentencing judge "set forth enough to satisfy [us] that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Carty*, 520 F.3d at 996 (alteration in original). The district court need not "articulate in a vacuum how each § 3553(a) factor influences its determination of an appropriate sentence," so long as it responds to "specific, nonfrivolous argument[s]" raised by the parties and "tethered to a relevant § 3553(a) factor." *Id.* at 992.

The record makes it clear that the district court considered § 3553(a) factors other than deterrence and protection of the public. For example, the sentencing judge considered the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment" under § 3553(a)(2)(A). The court specifically found that Treadwell "was the organizer or leader of an extensive criminal organization" and orchestrated a fraud that "went on for many years," "involved many different states," and "involved more than 1500 victims," and that at the time of sentencing "clearly [Treadwell] hadn't accepted responsibility." The district court also considered "the need to avoid unwarranted sentence disparities among defendants." 18 U.S.C. § 3553(a)(6). It correctly calculated and adhered to the appropriate Guidelines range, which in itself serves the purpose of avoiding sentencing disparities. *See Gall*, 552 U.S. at 54. It then explicitly addressed the disparity between the sentences of Treadwell and his co-defendant Acosta, concluding that Acosta's deci-

sion to plead guilty warranted the disparity. The district court also considered the need to provide restitution to victims under 18 U.S.C. § 3553(a)(7), ordering that Treadwell pay restitution in the amount of $44,872,152.00. To the extent that the sentencing judge did not expressly address particular § 3553(a) factors, we emphasize that a district judge is not required to expound on a particular § 3553(a) factor when a variance based on that factor is not urged by the parties or warranted by facts in the record. *See Gall*, 552 U.S. at 54 ("[I]t [is] not incumbent on the District Judge to raise every conceivably relevant issue on his own initiative."); *Carty*, 520 F.3d at 993.

Nor did the district court abuse its discretion by determining that "deterrence" and "protection of the public" outweighed the other § 3553(a) sentencing factors and were thus determinative of Treadwell's sentence. The court had ample evidence from which it concluded that Treadwell was a likely repeat offender who posed a substantial risk to others. The vast nature of Treadwell's scheme alone suggests that Treadwell poses a substantial danger to the public. Treadwell was the party principally responsible for the conspiracy; he was listed as president of Qwest, president, treasurer, and director of WBC, and as a director and the CEO of LWI. Moreover, Treadwell's pretrial release was revoked after the magistrate judge found "by clear and convincing evidence" that Treadwell violated a condition of his bond that he "not engage in any marketing, sales or promotion of any kind of investments or loans."

**[19]** The court also had ample evidence from which it could conclude that Treadwell is not easily deterred by the threat of punishment. Testimony at trial established that Treadwell had moved from investment scheme to investment scheme, culminating in an offshore entity to be used in an attempt to evade state and federal regulators. The court watched a video-recorded conversation in which Treadwell made a $500,000 deal with an informant in exchange for the informant's prom-

ise "not [to] go to the FBI or talk to them or help them out." The court heard substantial evidence from which it could infer that Treadwell, despite his increasing legal troubles, continued to make misrepresentations and attempted to further his scheme. In response to an accusation by an investor that his company was a Ponzi scheme, Treadwell replied that he had invested "42 million in assets" in a gold mining company in North Carolina and "a gold mine in Mexico that's worth 10 billion dollars" and that "that's all going to come out in court. We're going to show all of that . . . [Y]ou're going to see that the money went out to create money to be able to pay." Even at the time of his sentencing, Treadwell still attempted to blame the scheme on his attorney Acosta and on lies told to him by the companies in which he "invested," stating as follows:

> Your honor, I learned. I also learned to never, never, I mean never trust an attorney without having other attorneys' opinions. Looking back, your honor, I definitely was misled by attorney Arnie Acosta, that promised the moon, so to speak, but also believe in the companies that I invested. The company heads that I invested in. Those company heads lied about the returns of the company, our company was going to receive. I was gullible and really believed what was being said to me of those companies. . . . . I repeated what was told to me by my attorney Acosta and the business owners that promised high returns. I really believe[d] what they were saying was true . . . .

Given this evidence, the court did not abuse its discretion in determining that deterrence and protection of the public were of primary concern when imposing Treadwell's 300-month sentence.

## E

Treadwell next argues that the district court abused its discretion by failing to treat the Guidelines as advisory. Specifi-

cally, Treadwell contends that the district court's "heavy reliance" on the Guidelines was misplaced because the Guidelines require a "patently illegal" sentence higher than the authorized statutory maximum—in this case 324 to 405 months—and result in a "substantial overstatement of the seriousness of the offense" by focusing on the amount of loss. We disagree on both counts.

**[20]** First, contrary to Treadwell's argument, the range recommended by the Guidelines is not a "patently illegal" sentence as applied to Treadwell. Running consecutively, the statutory maximum sentences for Treadwell's five-count conviction authorize 85 years of total imprisonment. *See* 18 U.S.C. § 371 (5 year maximum per count of conspiracy); 18 U.S.C. § 1343 (20 year maximum per count of wire fraud not involving a "major disaster area" or a "financial institution"). The Guidelines expressly require the district court to group Treadwell's convictions—one count of conspiracy to commit wire fraud and four counts of wire fraud (2 SSER 1-10)—and calculate them as a single, aggregate sentence. *See* USSG § 3D1.2(d) (requiring offenses calculated under USSG § 2B1.1 be grouped because they are "determined largely on the basis of the total amount of harm or loss"). The district court did so, and calculated a sentencing range of 324 to 405 months. This range is well within the 85-year statutory maximum.

**[21]** Nor did the district court abuse its discretion when it refused to reduce further Treadwell's sentence on the ground the amount of loss had a "disproportionate effect" on his sentence. Although we do not automatically presume reasonableness for a within-Guidelines sentence, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Carty*, 520 F.3d at 994. In Treadwell's case, the district court explicitly considered the § 3553(a) factors and decided to impose concurrent sentences for the four wire fraud counts, reducing Treadwell's actual

time served to 300 months—the equivalent of the statutory maximum for a single count of wire fraud (20 years) and a single count of conspiracy (5 years). (TER 269, 294.) This sentence was below the *lowest end* of the recommended Guidelines range. Given the district court's findings regarding the seriousness and longevity of the offense, Treadwell's central role in the offense and need to deter recidivism and protect the public, the district court was well within its discretion in determining that further downward variance from the Guidelines range was not warranted.

## V

We next address the defendants' constitutional challenges to their sentences under the Ex Post Facto Clause and the Fifth and Sixth Amendments.

## A

Sluder and Saturday argue that their criminal conduct occurred before the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), and that the Ex Post Facto Clause prohibits the retroactive application of *Booker*'s remedial holding to that conduct. *See* U.S. Const. art. I, § 9, cl. 3. We review whether a sentence violates the Ex Post Facto Clause de novo. *United States v. Staten*, 466 F.3d 708, 713 (9th Cir. 2006).

[22] We need not labor long on this argument. The Supreme Court has told us that the Ex Post Facto Clause applies to actions by legislatures; it does not apply to judicial decisions. *See Rogers v. Tennessee*, 532 U.S. 451, 460 (2001) ("The Ex Post Facto Clause, by its own terms, does not apply to courts."). The Ex Post Facto Clause does not apply to *Booker*.

[23] Sluder and Saturday argue that *Booker* is "legislative" in the sense that the Court's remedial holding—which excised

two provisions in the Guidelines in order to render them advisory—"effectively enacted" a new version of the Sentencing Reform Act. Therefore, the argument goes, the Ex Post Facto Clause applies to this "legislative" action by the Supreme Court.

Sluder and Saturday fundamentally misunderstand the nature of the Ex Post Facto Clause. For the purposes of the Ex Post Facto Clause, it is irrelevant whether a decision of the Supreme Court is "judicial" or "legislative" in a descriptive sense. The Ex Post Facto Clause does not apply to decisions rendered by the courts as an institutional matter. *See Marks v. United States*, 430 U.S. 188, 191 (1977) ("The Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.") (internal citation omitted); *United States v. Dupas*, 419 F.3d 916, 920 n.3 (9th Cir. 2005) ("The Ex Post Facto Clause of Article I, Section 9, by its terms, applies only to changes in the law resulting from legislative or executive action . . . .").

Sluder and Saturday's argument could be alternatively construed as a Fifth Amendment Due Process Clause challenge to the retroactivity of *Booker*. The Supreme Court has held that although the Ex Post Facto Clause does not apply to courts, "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Rogers*, 532 U.S. at 456. Such a Due Process Clause argument, however, is foreclosed by our prior precedent. *See United States v. Ingham*, 486 F.3d 1068, 1078-79 (9th Cir. 2007) ("Ingham asserts that the district court's use of the Guidelines as advisory was an unconstitutional retroactive application of *Booker* under the . . . Ex Post Facto and Due Process Clauses. Again, Ingham's argument runs into the stone wall of our prior precedent."); *United States v. Dupas*, 419 F.3d 916, 919-21 (9th Cir. 2005).[13]

---

[13]Other circuits are in accord on this point. *See, e.g.*, *United States v. Lata*, 415 F.3d 107, 109 (1st Cir. 2005); *United States v. Vaughn*, 430

We hold that neither the Ex Post Facto Clause nor the Due Process Clause prohibit the application of *Booker* to the defendants' conduct, even though it occurred prior to the *Booker* decision.

**B**

All three defendants raise an as-applied Sixth Amendment challenge to their sentences, arguing that their sentences would not be "reasonable" under 18 U.S.C. § 3553(a) without relying on judge-found facts, in violation of their Sixth Amendment right to a jury trial. Sluder and Saturday raised this objection before the district court; Treadwell did not. We review Sluder and Saturday's challenge de novo, *see United States v. Labrada-Bustamante*, 428 F.3d 1252, 1261 (9th Cir. 2005), and Treadwell's challenge for plain error, *see United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc).

The defendants have adopted an argument that Justice Scalia, writing separately, has encouraged litigants to raise in several recent Supreme Court sentencing decisions. *See, e.g., Gall*, 552 U.S. at 60 (Scalia, J., concurring) ("The door therefore remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury."). The

---

F.3d 518, 524-25 (2d Cir. 2005); *United States v. Pennavaria*, 445 F.3d 720, 723-24 (3d Cir. 2006); *United States v. Davenport*, 445 F.3d 366, 369-70 (4th Cir. 2006), *overruled in part on other grounds by*, *Irizarry v. United States*, 128 S. Ct. 2198 (2008); *United States v. Austin*, 432 F.3d 598, 599-600 (5th Cir. 2005); *United States v. Barton*, 455 F.3d 649, 652-57 (6th Cir. 2006); *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005); *United States v. Wade*, 435 F.3d 829, 832 (8th Cir. 2006); *United States v. Rines*, 419 F.3d 1104, 1106-07 (10th Cir. 2005); *United States v. Duncan*, 400 F.3d 1297, 1306-08 (11th Cir. 2005); *United States v. Alston-Graves*, 435 F.3d 331, 343 (D.C. Cir. 2006).

defendants contend that "for every given crime there is some maximum sentence that will be upheld as reasonable [under § 3553(a)] based only on the facts found by the jury or admitted by the defendant." *Rita,* 551 U.S. at 372. According to the defendants, the facts found by the jury at their trial warrant only a 1 to 7 month sentence under the Guidelines.[14] Defendants argue that in their case, the relevant maximum sentence is not the maximum established by the federal wire fraud and conspiracy statutes, but rather the maximum of what we would consider "reasonable" when reviewing their sentences under § 3553(a) if we were to rely solely on the facts found by the jury. According to the defendants, their sentences— 300 months for Treadwell, 188 months for Sluder, and 63 months for Saturday—exceed this "reasonableness" maximum, and therefore their sentences violate the Sixth Amendment.

**[24]** We reject the defendants' argument, and join the Fourth, Sixth, and Seventh Circuits in holding that "this argument is too creative for the law as it stands." *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008); *United States v. Ashqar*, 582 F.3d 819, 825 (7th Cir. 2009) ("While this argument is not without its advocates, it is not the law." (internal citation omitted)); *United States v. White*, 551 F.3d 381, 384-85 (6th Cir. 2008) (en banc). "The 'statutory maximum' . . . is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis deleted). In *Booker*, the Supreme Court rendered the Guidelines advisory, permitting a district court to impose a sentence anywhere within the range established by the statute of conviction without violating the Sixth Amendment. The mere fact that, on appeal, we review the sentence imposed for "reasonableness" does not lower the relevant

---

[14]To calculate this suggested 1 to 7 month Guidelines range, the defendants rely on the Guidelines' "Base Offense Level" for wire fraud and conspiracy to commit wire fraud. *See* USSG § 2B1.1(a).

*statutory* maximum below that set by the United States Code. *See United States v. Raygosa-Esparza*, 566 F.3d 852, 855 (9th Cir. 2009) ("[E]ach offense carried a statutory maximum of five years imprisonment. The revised sentence imposed by the district court for each offense does not exceed this statutory maximum. Accordingly, no constitutional violation occurred, even if the district court did rely on facts not found by the jury." (internal citations omitted)); *White*, 551 F.3d at 384 ("In the post-*Booker* world, the relevant statutory ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code."). "Standing alone, judicial consideration of facts and circumstances beyond those found by a jury or admitted by the defendant does not violate the Sixth Amendment right to jury trial." *Raygosa-Esparza*, 566 F.3d at 855 (quoting *Ameline*, 409 F.3d at 1077-78). This is because "[a]s far as the law is concerned, the judge could disregard the Guidelines and apply the same sentence . . . in the absence of the special facts." *Rita*, 551 U.S. at 353. "So long as the Guidelines are advisory, the maximum a judge may impose is the *statutory* maximum." *Ashqar*, 582 F.3d at 825.

**[25]** The statutory maximum for each of the defendants' wire fraud convictions is 20 years' imprisonment. *See* 18 U.S.C. § 1343. The statutory maximum for each defendant's conspiracy conviction is 5 years' imprisonment. *See* 18 U.S.C. § 371. Accordingly, the maximum sentence for Sluder and Treadwell's four wire fraud convictions and one conspiracy conviction, if running consecutively, is 85 years imprisonment. And the maximum sentence for Saturday's three wire fraud convictions and single conspiracy conviction, if running consecutively, is 65 years imprisonment. The district court imposed a term of imprisonment of 300 months on Treadwell, 168 months on Sluder, and 63 months on Saturday, well below the maximum sentences authorized by statute. The district court's findings of fact during sentencing therefore did not violate the Sixth Amendment.

## VI

For the foregoing reasons, we reject the challenges of defendants Sluder and Saturday to their convictions, and we reject the challenges of all defendants to their sentences.

**AFFIRMED**.